MAX N. TOBIAS, JR., Judge.
| (James White (“White”) and Edward T. Davis (“Davis”) appeal their convictions for second degree murder, a violation of La. R.S. 14:30.1. For the reasons that follow, we affirm their convictions and sentences.

History of the Case

On 3 December 2009, the state indicted White and Davis for the second degree murder of Robert Wimsatt. Both White ' and Davis entered pleas of not guilty at their arraignments. They filed motions to suppress the . confession, evidence, and identification, which motions were subsequently denied. White filed a notice of alibi defense, and Davis filed a motion for speedy trial. Davis filed a motion to sever that the trial court denied on 28 February 2013.
On 8 August 2012, the state filed its notice of intent to offer the criminalist’s report as prima facie proof. Following a four-day jury trial in July 2013, the jury found the defendants guilty as charged on 26 July 2013.
The defendants’ timely motions for new trial and post-judgment verdict of acquittal were denied on 29 August 2013. Also, on that date, the trial court sentenced the *181 defendants to life imprisonment without benefit of parole, probation, or suspension of sentence. This timely appeal followed.
1 ⅞Facts, Evidence, and Testimony at Trial
Robert Wimsatt was shot and killed while servicing an ATM at a convenience store, Lawson’s Grocery, in the Algiers section of New Orleans on 16 June 2009.
I.
New Orleans Police Department (“NOPD”). Sergeant Nicholas Gernon investigated the shooting of Mr. Wimsatt that occurred at 1625 Newton Street. The initial report he received indicated that the victim was alive and in route to the hospital; however, by the time the sergeant arrived at the hospital, the victim had died. Sergeant Gernon relocated to the crime scene, arriving at about 11:00 a.m. Thé scene had already been taped off and was under the control of the police crime lab, which was photographing the area and collecting evidence — spent bullet casings, bank money, wrappers, and the victim’s shirt and keys. The sergeant then noted that the shooting actually occurred in the parking of Lawson’s Grocery. The serr geant identified photographs of the crime scene, including one of the victim’s bloody shirt showing a bullet hole in the front.
Sergeant Gernon’s inspection of the area around the victim’s vehicle indicated that the victim encountered — struggled with and/or attempted to flee — his assailant(s) while in, or close, to his vehicle. NOPD Officers canvassed the area for witnesses and surveillance video that might assist in the investigation; although the officers spoke with several people from the neighborhood, no one would give a statement because they did not want to be involved. The officers had no luck locating any surveillance video of the' actual crime; however, Sergeant Gernon did locate surveillance videos from several businesses short dis-r tances from the shooting scene, which enabled him to retrace the victim’s driving route from the |sbank, where the victim made a cash withdrawal at approximately 10:00 a.m., and then to the scene of the shooting, showing the victim’s time of arrival, as 10:13 a.m. Gernon noted that the videos showed a green Mitsubishi Montero Sport vehicle following the victim’s vehicle. The sergeant identified, a state’s exhibit as the map he drew depicting the victim’s route as shown in the surveillance videos. The information on the map indicated that the victim left the bank about 10:00 a.m., drove past O. Perry Walker High School and the naval base, and arrived at the convenience store. For days after the shooting, Sergeant Gernon canvassed the neighborhood for witnesses, but located none. He did, however, learn that the victim was accosted by two assailants.
II.
NOPD Detective Décirida Barnes[1] testified that she assumed the investigation of this homicide on 22 July. 2009, when Sergeant' Gernon was reassigned. She began her investigation by reviewing Sergeant Gernon’s report, viewing the crime scene, and meetihg with the victim’s family. She stated that on 23 July 2009, she held a press conference to announce that Crime Stoppers posted a $12,500.00[2] reward for information leading to the arrest of the perpetrator(s). Thereafter,’ the detective obtained the identity of the last person to use the ATM prior to the shooting, obtaining a name and address for that user/card *182 holder. The detective spoke with the cardholder, who directed her to Jamal Nailer (“Nailer”), the cardholder’s boyfriend. When Detective Barnes spoke with Nailer in mid-August 2009, he gave her the names of two individuals as suspects — James “Peanut” White and Edward Davis. Nailer identified the suspects from | photographic lineups compiled by the detective. Nailer also identified Beau Lester[3] (“Walton”) as an eyewitness to the shooting. Walton identified White as the shooter. Walton did not identify Davis from a lineup, although he knew Davis from the neighborhood and was aware of Davis’ association with White. Further investigation revealed that Davis lived in the 900 block of Newton Street and White lived in the 500 block of Wagner Street (which intersects Newton Street). Based upon that information Detective Barnes obtained arrest warrants for the defendants and search warrants for the defendants’ residences.
Detective Barnes executed the search warrant at White’s residence and recovered a pair of brown army-type shorts, a white t-shirt, three pieces of paper bearing White’s name and address, and a photograph of White and Davis together.
Detective Barnes identified a state’s exhibit as a map depicting the location of the shooting in relation to where the search warrants were executed. The two locations searched were within blocks of each other. Detective Barnes recalled that when White was arrested, he wore medium, shoulder length, dreadlocks.
Detective Barnes recounted that Davis gave her one recorded and two verbal statements, each of which was preceded by Davis’ signing waiver of rights forms. The detective identified a state’s exhibit as the waiver of rights form executed by Davis prior to his 14 August 2009 recorded statement. In that statement,[4] Davis |Rinitially denied knowing White, but later changed his story and admitted that he knew White and had seen him at Lawson’s Grocery on the day of the shooting. Davis also informed Detective Barnes that he purchased a gun from White two days after the shooting.
On 18 August 2009, Detective Barnes attempted to interview Davis once again, but she did not record the interview because Davis repeatedly contradicted himself.
Detective Barnes identified a state’s exhibit as the waiver of rights form executed by White, and stated that the gist of White’s statement to her was his denial of having shot the victim. Detective Barnes said that White claimed he was at work at the convention center at the time of the murder. White gave her the name of an individual who would verify his claim.
Under cross-examination, Detective Barnes testified that she did not recover a weapon from White’s residence,[5] but she *183 did recover a magazine containing .22 or .25 caliber bullets.[6] She also recalled that the murder weapon was a .38 caliber firearm, which was not recovered. She recovered no property belonging to the victim from White’s residence.
During further cross-examination, Detective Barnes denied threatening either of the defendants with the death penalty. She remembered that Davis said he bought a .38 caliber weapon from White two days after the shooting. She denied purposely not recording the first half of Davis’ statement because he was not saying what she wanted him to say. Detective Barnes acknowledged that the 16murder weapon was a .38 caliber handgun, that the bullets which killed the victim did not match Davis’ .38, and that the murder weapon had never been recovered.
Explaining why none of the clothing recovered from White’s residence was submitted for DNA testing, Detective Barnes said she knew what blood stains look like, and she could recognize gunpowder residue. She examined the clothing and found no useable evidence for testing. She added that it was apparent the clothing had been laundered recently, so it was deemed of no evidentiary value.
III.
Walton testified on behalf of the state and admitted that he was incarcerated at the time of trial and had several criminal convictions — burglary of an inhabited dwelling, possession of heroin, and possession of marijuana. Walton said that on the day of the shooting he was sitting on the front porch of a friend’s residence, across the street from Lawson’s Grocery. He looked toward the grocery and noticed a man struggling with the victim in the parking lot. It appeared that the two were tussling over something the victim had in his hand. A few seconds later, gunshots rang out. The victim fell to ground. He witnessed the shooter stand over the victim and fire three/four more shots. Walton did not speak with police the day of the shooting, but Detective Barnes contacted him a few days later by cell phone as he was waiting to board a bus on his way to work. Detective Barnes met him at the bus stop. Walton told the detective that he recognized the shooter, and that his name was “Peanut.” Walton viewed a photographic lineup from which he identified White as “Peanut,” the man he saw shoot the victim. He pointed out the defendant in the courtroom. He stated that he recognized White from seeing him on numerous occasions in the neighborhood. Walton also said he recognized Davis as the man who was with White at the time of the shooting. Walton denied ^receiving any reward for identifying the defendants, and said that he had not been promised anything in return for his testimony.
Walton stated that he had appeared before the grand jury and related what he witnessed. He added that after he spoke with Detective Barnes, he was attacked by two unknown males. His injuries sustained in the attack required medical attention.
During cross-examination, Walton acknowledged that he viewed the shooting from a distance of approximately eighty-eight yards. Walton said that the shooter wore cargo pants, a white t-shirt, and a cap. He saw a second man drive away from the scene in a black and gold/silver Montero. He denied that he was testifying to save himself from a multiple bill, and, further, said that he was not aware of any reward money. Walton told Detective Barnes that he could not see the second *184 man’s face, and he was unsure if the second man was involved in the shooting. However, on redirect, Walton was positive that the shooter was White, and that Davis was the second man at the scene. He adamantly said he recognized the two at the time of the shooting because he had seen them together in the neighborhood on many prior occasions.
IV.
Nailer testified that he was twenty-four years old and had grown up in Algiers. He admitted that he was incarcerated at the time of trial, and asserted that he had no prior convictions. He stated that he knew both defendants his entire life because they had all grown up together in Algiers. He identified the defendants in court and said that White went by the nickname “Peanut.”
Recounting the events of 16 June 2009, Nailer said he attempted to use his girlfriend’s ATM card to obtain cash from the ATM machine located at Lawson’s IsGrocery, but the machine was empty. As he was preparing to leave, he spotted White and Davis. As White entered the store, he told him, “I might get ready to handle my business. I’m a holler at you later. Go home, be safe.” Nailer said he knew White meant he was about to get into something no good. Nailer noticed the silhouette of a gun under White’s shirt. Davis did not say anything to him, appearing to be very nervous. Nailer said he heeded White’s advice to leave the store. As he left, Nailer saw Walton sitting on the porch of a house across the street. Nailer also said that as he was leaving the store, he thought he remembered seeing a white man arrive to service the ATM. He walked toward his home around the corner. A short time later, he heard gunshots and began to run.
Shortly thereafter, Nailer returned to the scene and observed the paramedics moving the victim’s body into an ambulance. He did not speak to police at that time because he feared for his life and the lives of his family. However, about one or two months later, he met with Detective Barnes, telling her what he witnessed while at the grocery on the day of the shooting. From photographic lineups provided by Detective Barnes, Nailer identified White as the armed man and Davis as the man who was with White at the grocery.
Nailer admitted that, at a motion hearing prior to trial, he recanted everything he had earlier told Detective Barnes about the day of 16 June 2009. He explained that he did so because he was scared that he would be killed if he testified against the defendants. He added that as a result of recanting his earlier testimony, he was charged with perjury. After speaking with his attorney, Nailer agreed that for his safety, he should be held in police custody until trial of this matter.
| ciUnder cross-examination, Nailer admitted that part of his reason for testifying at trial was to rid himself of the perjury charge relating to the recantation of his testimony concerning White and the shooting. The other reason was to help the victim’s family get justice. He denied any interest in the reward money and claimed he was telling the truth at trial about the shooting.
V.
George Flood (“Flood”), who was incarcerated at the time of trial, testified that he became acquainted with Davis while they were both in the Orleans Parish Prison. He notified the District Attorney that he received. information about this case from Davis. Flood said that Davis told him that he and “Nut” robbed the ATM *185 man. Davis explained to him that while he and White were in the convenience store, a friend of theirs came into the store. White told.the Mend to be safe and leave the store. Davis also told him that “had they [defendants] waited until the [victim] came out [of the store] they would have gotten more money,” Flood said he wrote letters to “Nut” for Davis in which Davis assured “Nut” he would not turn state’s witness. Flood explained that Davis recounted that he and White were from the area where the murder occurred, and they knew the victim’s schedule for servicing the ATM machine. Davis told him that they got less than $5,000.00 from the victim, and the victim had another $20,000.00 to $30,000.00 in the back of his truck. Flood said Davis told him that White was the shooter.
Flood indicated that Davis told him that White’s defense was that he (White) was already clocked in at his job at the time of the shooting, and that would be White’s alibi. He recalled that one day when Davis returned from court, he told Flood: “... you know, the [victim’s] daughter was crying ... you know, it’s been Imfour years, you know. I wish the b* * *h would hurry up and get over it. It’s been four years ... [h]e’s dead already.”
On cross-examination, Flood denied receiving any promise of preferential or lenient treatment from the District Attorney in exchange for his testimony.
VI.
The state and defense stipulated that if forensic pathologist Dr. Samantha Hubert were called to testify, she would verify that the death was classified as a homicide. The state introduced Dr. Hubert’s autopsy protocol.[7]
VII.
The state called attorney Robert Jenkins who testified that he presently represented Nailer on the perjury charge in Orleans Parish Criminal District Court. He had requested that Nailer be held without bond for his personal safety. Mr. Jenkins recalled that Nailer was not allowed to contact anyone or let his family know where he was.
VIII.
The defense began its case with the testimony of Ms. Naomi White, White’s mother. Ms. White verified that her son went by the nickname'“Peanut.” She testified that her son finished high school and was employed by the New Orleans Convention Center at the time of this murder. His work uniform consisted of black pants and a black shirt with an arrow emblem on it.
Ms. White recalled that on 16 June 2009, she arose at about 6:30 a.m. and realized that her son overslept. He was due at his job at 5:30 a.m. Because he had |nno car, her son took a cab to work. He returned from work, still wearing his uniform, at about 3:00 p.m. that day.
IX.
Next, Ronnie Tyler (“Tyler”) testified that he was employed as a manager by Arrow Mart (the Atrium Restaurant), the company that supplied food to the New Orleans Convention Center. Tyler had placed White in a training position to eventually-become part of management and he worked with' him there. He remembered that White did not arrive for work until 8:00 a.m. on the day of the murder. He counseled White about being late. Once *186 White began to do his job, Tyler said it would have been impossible for White to have left the convention center between 8:30 a.m. and 10:30 a.m. on 16 June 2009, without him knowing about it.
Tyler said he learned of the 16 June 2009, shooting on the 10:55 a.m. WWL-TV news broadcast on one of the televisions at the convention center. He remembered someone discussing with White that the shooting occurred in White’s neighborhood.
Under cross-examination Tyler said that when he learned of White’s alleged involvement in this murder, he checked company computer records to determine exactly when White clocked in and out of work on the day in question. He denied that it was common practice for employees to clock one another in and out. Tyler admitted that he did not see White clock in or out on 16 June 2009, but said he was positive White was at work at 10:13 a.m. on that day.
X.
112Parlene Fortune (“Fortune”) testified that she knew White from the convention center where she worked as concession stand manager. Her job required her to oversee White, who worked as a runner, a person who makes trips to the kitchen and warehouse, mops, sweeps, and fills ice machines. She remembered that White was late arriving at his job on 16 June 2009. She recalled that White was at the convention center on the day,in question between 10:00 and 10:30 a.m. because she directed him to go the kitchen and warehouse before 10:30 a.m.
On cross-examination, Fortune said that the last time she saw White at work on 16 June 2009, was at 5:00 or 6:00 p.m.
XI.
Rodney Williams (“Williams”) testified that he worked for Arrow Mart at the convention center and was White’s coworker. He remembered that White was late for work on 16 June 2009. Williams said White worked in different areas in the convention center, not just in the Atrium, but White was in the kitchen with him at 10:30 a.m. on the day in question. He added that he did not see White at 10:30 a.m. on every work day, for it depended on what was going on at the center.
On cross-examination, Williams admitted that in a statement given to the District Attorney’s Office on 5 November 2009, he said that the last time he saw White on 16 June 2009 was at 9:15 a.m. and then did not see him anymore until the end of the work day.
XII.
White testified that he was known as “Peanut,” a nickname he acquired in childhood. He said he graduated from Walter Alcorn High School in 2004, and in June 2009 he was working at the New Orleans Convention Center as a food | ^runner; however, he had recently been promoted to supervisor. White said he was due at work at 5:30 a.m. on 16 June 2009, but overslept. His mother woke him, and he dressed in his uniform — black shirt and pants. He called a cab, which arrived at about 7:00 a.m., and he arrived at work about 8:00 a.m. He stated that he did not own a vehicle and never rode in a Montero. At 10:30 a.m. on the day of the murder, he asserted he was at work. Further, he said he did not see Davis, nor did he go to Lawson’s Grocery on 16 June 2009. White denied shooting and robbing the victim. He denied any participation in the crime and even claimed he was afraid of guns. White said Nailer blamed the shooting on him because they used to fight as children, and Nailer did not like him.
*187 On cross-examination, White said he clocked out from work between 2:00 p.m. and 3:00 p.m. on 16 June 2009. He explained that Fortune was incorrect in her testimony about the time he left work. White said he did not know why Walton said he saw him at Lawson’s Grocery on the day of the murder. As for the bullets found at his house, White said he did not know who put them there. He denied selling Davis a gun. Initially, White denied learning of the shooting until a few days after it happened; however, when confronted with Tyler’s testimony about White being present with co-workers at the time WWL-TV reported the shooting the day it happened, White backtracked and said he had forgotten that, but he agreed that that was when he learned of the incident. When questioned about his method of elockihg in for work, White admitted that theoretically if someone had the last four digits of his social security number, that person could clock him in and out of work.
XIII.
114The defense called Detective Gernon who identified a crime scene photograph in which members of the media are seen. Detective Gernon also reaffirmed that he arrived on the scene about 11:00 a.m., and the media was already on the scene. The detective perused the crime scene report authored by the crime lab, which indicated that dispatch notified the lab of the shooting at 10:35 a.m., and lab personnel arrived at the scene at 10:47 a.m. Detective Ger-non indicated that by 11:00 a.m., the news media did not know any details about the shooting or that the victim had died.
XIV.
The state and the defense then stipulated to the authenticity of defense exhibits, White’s timecard, and the schedule for workers from the day of the shooting.
XV.
The defense called Detective Barnes. She stated that she was present for the execution of the search warrant at White’s house on 14 August 2009, and she found money in a safe at the house. The money was in $100 denominations. Because the money carried by the victim for the ATM was in $20.00 denominations, Detective Barnes did not seize the money she found from the house, as she did not believe it was the money stolen from the victim. Detective Barnes recalled that she collected the records of the cab driver who drove the defendant to work on the day of the shooting.
XVI.
The final witness for the defense was Wilford Stofas (“Stofas”), who testified that he became acquainted with both Davis and Flood while all of them were incarcerated in Orleans Parish Prison. Stofas said that Davis and Flood were |lson friendly terms and spoke to each other frequently. He stated that Davis never confessed anything to him, and as far as he knew, Davis never revealed anything about his case to Flood. Stofas said he never knew Davis to send messages to White through Flood.
A.

Errors Patent

A review for errors patent on the face of the record reveals none.
B.

Discussion and Analysis of Assignments of Error

(1)

White’s Assignment of Error Number 1

Davis’Assignment of Error Number 1

When issues are raised on appeal as to the sufficiency of the evidence and as *188 to one or more trial errors, the reviewing court should first determine that issue. State v. Marcantel, 00-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55, citing State v. Hearold, 603 So.2d 731, 734 (La.1992).
White and Davis both contest the sufficiency of the evidence to support their convictions, arguing that the state failed to negate the reasonable probability of mis-identification by the state’s witnesses. White maintains that his alibi proves he could not have committed the murder, while Davis points out that no physical evidence exists linking him to the crime. Moreover, the defendants point out that the state’s witnesses changed their stories and gave testimony favorable to the state in exchange for leniency for their pending prosecutions and the reward money.
|1fiIn evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757, 758 (La.App. 4th Cir. 1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305, 1311 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The factfinder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. See Mussall, supra; Green, supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
In addition, when circumstantial evidence forms the basis of a conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372, 377 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198, 1201 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817, 819-820 (La.1987).
Absent internal contradiction or irreconcilable conflict with the physical evidence, “[t]he testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction.” State v. Wells, 10-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306; State v. Marshall, 04-3139, p. 8 (La.11/29/06), 943 So.2d 362, 369, citing State v. Legrand, 864 So.2d 89, 94 (La.2003). A reviewing court does not reweigh the credibility of witnesses when reviewing sufficiency of evidence claims. State v. Rosiere, 488 So.2d 965, 968 (La.1986). .A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 09-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
*189 The defendants were charged with second degree murder, which is defined in La. R.S. 14:30.1 A as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily-harm, or when the offender is engaged in the perpetration or attempted perpetration of specific enumerated felonies, including armed robbery, even-though he has ho intent to kill or to inflict great bodily harm. Thus, to prove second degree murder the state must prove the killing of a human being either with specific intent or when the offender is engaged in one of the listed crimes.[8]
 “Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal | ^consequences to follow his act or failure to act.” La. R.S. 14:10(1). Determination of specific criminal intent is a question of fact for the trier of fact. State v. Huizar, 414 So.2d 741, 751 (La.1982). Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of defendant. State v. Graham, 420 So.2d 1126, 1127 (La.1982).
“All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.” La. R.S. 14:24. Only those persons who “knowingly participate in the planning or execution of a crime” are principals to that crime. State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, 428. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. Id. The mental state of one defendant' may not be imputed to another defendant. Thus, mere presence at the scene of a crime does not make one a principal to the crime. State v. Coleman, 02-0345, p. 4 (La.App. 5 Cir. 9/18/02), 829 So.2d 468, 471. However, “‘[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice’s intention.’ ” State v. Kirkland, 01-425, p. 8 (La.App. 5 Cir. 9/25/01), 798 So.2d 263, 269. A defendant can be convicted of intentional murder even if he has not personally struck the fatal blows. State v. Wright, 01-0322, p. 8 (La.12/4/02), 834 So.2d 974, 982.
In addition to .proving the statutory elements of the charged offense at trial, the state is required to prove a defendant’s identity as the perpetrator. State v. Page, 08-531, p. 6 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 447. Where the key |1aissue is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. Id.
Although the state lacked any physical evidence connecting either of the defendants to the crime, the state had witnesses who testified before the grand jury and at trial, placing the defendants at the convenience store at the time of the murder.
Nailer testified that he was- at the convenience store on the morning of the shooting using the ATM. He saw both White and Davis, whom he had known since childhood, there also. He said that Davis appeared to be nervous and uncom *190 municative, but White spoke to him, advising him to leave the premises for his safety as he (White) “was about to take care of his business.” Nailer said he definitely saw the silhouette of a gun under White’s shirt, and he heard gunshots as he walked to his nearby residence. Moreover, Nailer testified that as he was leaving the store, he observed Walton sitting on the porch of the house across the street from the shooting scene, which lends credence to Walton’s testimony of having witnessed Davis and White scuffle with and rob the victim and White shoot the victim three or four times. Walton indicated that White ran from the scene, and Davis drove away. Walton positively identified White and Davis from seeing them together on numerous occasions in the neighborhood. The record indicated that at the time of the shooting, the weather was clear and sunny, making for a favorable visual observation of the incident.
Although the defense is correct about Nailer changing his story, he explained he did so because he feared for his life and the safety of his family, who still lived in the neighborhood around the shooting scene. Moreover, he denied receiving any reward money for his testimony, and further, testified that he was not | ^promised any consideration or special treatment from the state on his perjury prosecution.
Davis gave a statement to the police placing himself and White at the convenience store just prior to the shooting. He also admitted purchasing a gun from White two days after the shooting.
Flood, who became acquainted with Davis while they were incarcerated in Orleans Parish Prison, testified that Davis admitted that he and White planned the robbery and took the victim’s money, but it was White who killed the victim. Davis explained to Flood that he and White were familiar with the victim’s schedule and driving route to fill the ATM. Flood even said that Davis told him White intended to use an alibi defense at trial because he had clocked into work on the morning of the murder. Like Nailer, Flood denied being offered anything in exchange for his testimony at trial and also said that he was unaware and certainly did not receive any monetary benefit from his testimony.
The defense argues that its witnesses were more believable in their testimony. However, none of White’s co-employees testified that he or she saw him on work premises between 10:00 a.m. and 10:15 on the morning of the shooting. Tyler, White’s boss, was adamant that he and a group of employees, including White, learned of the shooting from the 10:55 a.m. WWL-TV news broadcast on 16 June 2009. However, in stark contrast to Tyler’s testimony was Sergeant Gernon’s certainty that he did not arrive on the shooting scene until 11:00 a.m., and that although there were media personnel there at that time, there was no information communicated to the press by the police by 10:55 a.m. Further, Sergeant Gernon said that information the police gave the media did not include the victim’s name.
|21Even White’s own testimony did not benefit his case. White admitted that it was possible for anyone to clock him in or out of work using the last four digits of his social security. This testimony supports Davis’ statement to Flood that White was already signed into work at the time of the shooting and would use that as his alibi.
In this case, the jury chose to credit the testimony of the state’s witnesses over that the defense’s witnesses. A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 09-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
*191 Viewing the evidence in the light most favorable to the state, the jury could have reasonably concluded that the identity of the defendants was unquestionable, and the verdict of guilty of second degree murder as to each defendant was justified by the record of the proceedings. This assignment has no merit.
(2)

Davis’ Assignment of Error Number 2

In a second assignment, Davis argues that the trial court erred by allowing Walton to testify that he was attacked by two unknown assailants after he met with Detective Barnes.
This assignment stems from the following exchange between the prosecutor and Walton:
Prosecutor: After you made this statement to Detective Barn[e]s, did you also come to the District Attorney's Office and testify before the grand jury?
Witness: Yes, I did.
122Prosecutor: At some point after you met with Detective Barn[e]s, but before you testified before the grand jury, did you—were you involved in an incident where you were injured?
Witness: Yes, I did.
Prosecutor: Can you describe what happened to the ladies and gentlemen of the jury?
Witness: When I was walking through the park going to—towards Pace Boulevard, two guys jumped up out of a car and asked me if I know, he said, hey,—
Defense Counsel: Objection to relevancy, Your Honor.
The Court: Sustained.
Defense Counsel: Hearsay.
The Court: Sustained.
Prosecutor: And were you injured as a result of the incident?
Witness: Yes, I was, ma’am.
Defense Counsel: Objection to relevancy-
The Court: Overruled.
Prosecutor: And where was the injury?
Witness: On the side of my head, ma’am.
Prosecutor: And did you receive medical treatment for that injury?
Witness: Yes, I did.
Prosecutor: Were you able to identify the perpetrators of that incident?
Witness: No, I couldn’t see because they had something—you know, I couldn’t see where they was. They came up behind me.
The Court: That’s enough.
laThe defense argues that the foregoing portion of Walton’s testimony was irrelevant and highly prejudicial in that it served no purpose other than to portray the defendants as dangerous people.
All relevant evidence is admissible, and evidence that is not relevant is not admissible. La. C.E. art. 402. La. C.E. art. 401 defines relevant evidence as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” A trial court’s ruling as to the relevancy of evidence will not be disturbed absent a clear abuse of discretion. State v. Girard, 12-0790, p. 6 (La.App. 4 Cir. 3/6/13), 110 So.3d 687, 691, writ den., 13-0795 (La.9/20/13), 123 So.3d 170.
La. C.E. art. 403 states: “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” “Unfair prejudice,” as used in La. C.E. art. 403, means that “the offered evidence has ‘an undue tendency to suggest decision on an improper basis, *192 commonly, though not necessarily, an emotional one.’ ” Author’s Note (3), La. C.E. art. 403, Handbook on Louisiana Evidence Law, Pugh, Force, Rault & Triche, p. 380 (2011). A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. State v. Henry, 11-1137, p. 9 (La.App. 4 Cir. 10/24/12), 102 So.3d 1016, 1022.
The state maintains that the evidence was relevant to the jury’s determination of Walton’s credibility and/or consciousness of guilt by the defendants.
124That Walton suffered an attack by two unknown assailants was irrelevant to the defendants’ guilt of the crime charged. The state did not articulate a reason for the attack, nor was the identity of the assailants established or any connection made between them and the defendants. Although the trial judge erred by admitting the evidence, Davis has not shown any prejudice. If the evidence was erroneously admitted at trial, the trial court’s ruling is subject to the harmless error analysis. Chapman v. California, 386 U.S. 18, 22-24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Walker, 99-2868, p. 8 (La.App. 4 Cir. 10/18/00), 772 So.2d 218, 223. The test for determining harmless error is “whether the guilty verdict actually rendered in this trial was surely unattributable to the error.” Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) [emphasis in original].
The defendants in this case were placed at the location and time of the murder by Nailer, who testified that he and the defendants grew up together in the same neighborhood as the location of the shooting. Moreover, Walton unequivocally identified the defendants as the men he saw attack the victim. Further, he emphatically testified that he witnessed White shoot the victim to death. Like Nailer, Walton recognized the defendants from the neighborhood and was aware of their association. If an error exists, it was harmless given the totality of the evidence of guilt, presented at trial. This assignment of error has no merit.
(3)

White’s Assignment of Error Number 2

In a second assignment, White asserts that the trial court erred by admitting at trial the statement Davis gave to the police. White argues that the statement is testimonial hearsay under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), and that by allowing the hearsay statement of l^the non-testifying and hence unavailable Davis to be used against him, White’s right, of confrontation was violated.
The state counters that Davis’ statement was admissible as a non-hearsay admission against Davis pursuant to La. C.E. art. 801 D(2).[9] The state also notes that White *193 indicated on several occasions that he did not want his case severed from Davis’ case, which is contrary to Davis’ wishes as expressed in his February 2013 motion to sever.
The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront' witnesses against him. The Confrontation Clause bars the admission of an out-of-court “testimonial” statement against a criminal defendant unless the declarant is unavailable and the defendant had a proper opportunity to cross-examine the declarant. See Crawford, 541 U.S. at 68, 124 S.Ct. 1354; Davis, supra.
While Crawford declined to define the word “testimonial,” it recognized that, at a minimum, testimonial statements include “prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.” Crawford, 541 U.S. at 68, 124 S.Ct. 1354. The Supreme Court stated that “testimony” is “[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.” Crawford, 541 U.S. at 51-52, 124 S.Ct. 1354.
| gfiThe Sixth Amendment bestows an individual the right of confrontation to confront witnesses who “bear testimony” against him. According to the Supreme Court, an accuser making a formal statement to government officials bears testimony in a sense that a persqn making a casual remark to an acquaintance does not. Some examples of testimonial statements include affidavits, custodial examinations, depositions, prior testimony, confessions, or similar pretrial statements that declarants would reasonably expect to be used in a prosecution. Crawford, supra.
By contrast, non-testimonial statements do not cause the declarant to be' a witness within the meaning of the Sixth Amendment and thus are not subject to the Confrontation Clause. Davis, 547 U.S. at 821-822, 126 S.Ct. 2266.
Applying Crawford to the analysis of this case, Davis was unavailable because he chose to exercise his Fifth Amendment privilege against self-incrimination, and White had no opportunity to cross-examine-him.
Davis’ statement was testimonial. It was given under police interrogation for the purpose of identifying and prosecuting the perpetrators in this case. Davis’ statement places White at the scene and time of the shooting,-thus disproving White’s- alibi defense. Davis’ statement should not have been admitted. However, as noted in State v. Legendre, 05-1469, pp. 9-10 (La.App. 4 Cir. 9/27/06), 942 So.2d 45, 52, confrontation errors, including Crawford violations, are subject to a Chapman harmless error analysis. The proper standard of review is as follows:
The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is- nonetheless convinced that the error was harmless beyond a reasonable doubt.... Factors to be considered by the reviewing court include “the importance of the witness’ testimony in the prosecution’s case, whether the testimony wasj^cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.”
Given the testimony of the state’s witnesses, Walton, Nailer, and Flood, the *194 jury’s verdict was unattributable to Davis’ statement. This assignment is meritless.
(4)

White’s Assignment of Error Number 3

White asserts that the trial court erred by denying his Motion for Mistrial based upon the introduction of inadmissible “other crimes” evidence.
In State v. Chairs, 99-2908, pp. 5-6 (La.App. 4 Cir. 2/7/01), 780 So.2d 1088, 1093, this court noted:
A mistrial is warranted under La. C.Cr.P. art. 770 when certain remarks are considered so prejudicial and potentially damaging to a defendant’s rights that even a jury admonition cannot provide a cure. State v. Johnson, 94-1379, p. 16 (La.11/27/95), 664 So.2d 94, 101. Potentially damaging remarks include direct or indirect references to another crime committed or alleged to have been committed by the defendant, unless that evidence is otherwise admissible. La. C.Cr.P. art. 770(2). The comment must be within earshot of the jury and must be made by a judge, district attorney, or other court official. Id. A comment must be viewed in light of the context in which it is made and the comment must not arguably point to a prior crime and must unmistakably point to evidence of another crime. State v. Edwards, 97-1797, p. 20 (La.7/2/99), 750 So.2d 893, 906, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999). In addition, the imputation must unambiguously point to the defendant; and[,] the defendant bears the burden of proving that a mistrial is warranted. Id. If the elements of Article 770 have not been satisfied, the decision on the motion for mistrial is governed by La.C.Cr.P. art. 771.
A mistrial is a drastic remedy and only authorized where substantial prejudice will otherwise result to the defendant. State v. Banks, 96-2227, p. 2 (La] 284/18/97), 692 So.2d 1051, 1053. This determination (of whether prejudice has resulted) is within the sound discretion of the trial court. Id.
During her cross-examination of White, the prosecutor asked him how he learned of the Mr. Wimsatt’s murder:
Prosecutor: So it was just another shooting ...
White: I don’t pay attention to shootings on TV. I don’t watch the news. I don’t watch shootings and murders on TV. I’m not into murder and shooting people.
Prosecutor: You’re not into shooting people?
White: No, I’m not.
Prosecutor: You’ve never been inculpated or you’ve never been involved in another shooting?
White: No, I[‘ve] never been involved in another shooting.
Prosecutor: Okay. Do you know a man named Gary Badon?
Defense Counsel: Objection.[10]
At this point, the trial judge excused the jury and discussed the issue with all counsel. The trial judge refused to allow the line of questioning to continue because the defendant had not been convicted of any crime involving Gary Badon, and further, because the District Attorney failed to file a La. C.E. art. 404 B notice.
*195 In this case, White has failed to show that substantial prejudice existed that deprived him of a fair trial. As noted in Chairs, the offending remark must unmistakably point to evidence of another crime, and the imputation must unambiguously point to the defendant. Edwards, 97-1797 at p. 20, 750 So.2d at 906. Neither of those criteria was met in this case. No mention of a crime, directly or indirectly is present; consequently, no imputation of guilt exists as to the | ^defendant. In addition, White did not even acknowledge knowing Gary Badon. Finally, the evidence in this case was, what one might say, overwhelming, and showed that the jury’s verdict was not attributable to the question. The trial judge did not abuse his discretion by refusing to grant the mistrial. This assignment has no merit.
C.

Conclusion

For the foregoing reasons, we affirm the convictions and sentences of White and Davis.
AFFIRMED.

. In the appellate record, Detective Barnes' name is also spelled as “Barns.” We elect to spell the name as "Barnes.”

. The reward was subsequently increased to $25,000.00.

. Beau Lester is also referred to as Beau Lester Walton, who will henceforth be referred to as Walton. The record reflects that Walton viewed the shooting from the front porch of the house bearing municipal number 919 Wagner Street.

. Detective Barnes explained that the first part of the statement is not heard on the tape because she was unaware the recorder was not operating at that time, so that part of the statement heard at the beginning of the tape is actually the middle of Davis’ statement. The state played that taped statement for the jury and provided a written transcription thereof. Further, Detective Barnes testified that at the time Davis’ statement was taken, it was police policy that it was left to the discretion of the investigating detective whether to record a witness’ statement. Although requested by this court, the audio recording of Davis’ statement was not received.

.Later on re-direct, Detective Barnes testified that a .38 caliber handgun was recovered during the search of Davis' residence.

. The bullets which killed the victim were .38 caliber.

. The autopsy protocol indicates that the victim succumbed to five gunshot wounds — one to the head and the remaining to the torso and extremities.

. In the present case, according to the jury instructions, it appears that the state prosecuted this case under both theories of murder: specific intent murder and murder committed during an armed robbery.

. La. C.E. art. 801 D(2) provides in pertinent part:
Art. 801. Definitions
[[Image here]]
D. Statements which are not hearsay. A statement is not hearsay if:
[[Image here]]
(2) Personal, adoptive, and authorized admissions. The statement is offered against a parly and is:
(a) His own statement, in either his individual or a representative capacity;....

. We find no indication in the record that the defense moved for a mistrial or an admonition.