# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-1060


STATE OF LOUISIANA

VERSUS

DILLION WADE TRAHAN

AKA DILLON WADE


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 150841
HONORABLE MARILYN C. CASTLE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JOHN D. SAUNDERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.


**AFFIRMED.**

**Keith A. Stutes**
**District Attorney, Fifteenth Judicial District**
**J.N. Prather, Jr.**
**Roger P. Hamilton, Jr.**
**Assistant District Attorneys**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
      **State of Louisiana**

**Edward K. Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Dillion Wade Trahan**

**SAUNDERS, Judge.**

On May 27, 2015, Defendant, Dillion Wade Trahan aka Dillon Wade, was charged by bill of indictment with the January 28, 2015 second degree murder of Silas Tate, in violation of La.R.S. 14:30.1. On September 7, 2017, a jury found Defendant guilty as charged. On September 14, 2017, Defendant was sentenced to life imprisonment without the benefit of probation, parole, or suspension of sentence, as required by La.R.S. 14:30.1.

Defendant now appeals his conviction and sentence, raising a single assignment of error: the evidence introduced at trial is insufficient to support his conviction for second degree murder.

## FACTS:

Staff Sergeant Michael Hiatt of the Lafayette Parish Sheriff's Office testified that he was a detective in the "crimes against persons unit" at the time Silas Tate was killed. Sergeant Hiatt testified he was the on-call detective and was called out with information that someone had been shot and there were witnesses and officers on the scene. He stated that when he arrived at the scene Anthony Savoy and Charlotte Broussard were attempting to transport Silas Tate to the hospital; Kelsey Trahan, Dylan Guidry, and Steve Trahan, Jr. were in Steve Trahan, Jr.'s home; and Steve Trahan, Sr. and Heather Trahan were in their home. Anthony, Charlotte, Steve Trahan Sr., and Steve Trahan Jr., live in trailer homes near one another.

Sergeant Hiatt stated that Charlotte Broussard advised him that she had given Anthony Savoy permission to use a trailer located on the Trahans' property, and that in the process of retrieving the trailer Anthony knocked down the Trahan's gate, which resulted in an altercation in front of Anthony's trailer between her, Anthony Savoy, Silas Tate, Steve Trahan Sr., Steve Trahan, Jr., Dylan Guidry, and Defendant, during which time Heather Trahan made two 9-1-1 calls. Sergeant Hiatt

testified that Charlotte advised him that at onset of the altercation Steve Sr. was chasing her with a knife, then he began chasing Silas with it, that she heard gun shots, and saw Silas fall. Initially Charlotte said the shots came from where Dylan Guidry was standing, but later said that the shots came from where Defendant was standing. She also stated that when Silas went down, Steve Sr., Steve Jr., and Dylan Guidry were all in front of her and none of them had a gun.

The others involved in the altercation were also interviewed. However, the statements given by those witnesses were either evasive, inconsistent, or later recanted.

Sergeant Hiatt testified that Kelsey and Dylan's stories changed over time. Initially they both stated that they were inside their home when the altercation occurred, had not seen anything, and neither recalled seeing Defendant that night. Later Kelsey stated that Defendant could have been there, although she was not certain. Whereas, Dylan later stated that both he and Kelsey had seen Dillion that night.

Sergeant Hiatt testified he believed that the Trahan family was trying to cover up Dillion's involvement:

> During my interviews with the family, it was a lot of trying to cover up where Dillion was. He wasn't there. Then, some said he was there. Then, some said they never saw him. Some said he was camping. And so it was a bunch of misdirection from the family during the interviews.

Steve Trahan, Sr.'s story changed repeatedly. Initially he stated that during the altercation he was inside his home waiting on law enforcement, then he stated that his involvement consisted of yelling at Anthony from across the yard, then he stated that he was at Anthony's during the altercation. He also stated that he was unsure if Defendant was there, but subsequently stated that he had told Defendant not to go to Anthony's. Finally, he stated "he fucked up", meaning Defendant.

2

Heather Trahan, Defendant's mother, initially claimed that none of her family had gone to Anthony's, but the State introduced recordings of her 9-1-1-calls that disprove that. In her initial 9-1-1 call regarding Anthony taking the trailer, Heather tells law enforcement they needed to hurry up and get there before "somebody is gonna really get badly hurt." She also states that there are four vehicles at Anthony's: Anthony's truck, Charlotte's car, a black SUV, and a grey car, but that she does not know to whom the last two vehicles belong. In her follow up call to 9-1-1 Heather repeatedly stops speaking to the dispatcher so that she can yell at people at the scene, at some point yelling at "Dillion" to quit and at other times yelling at both "Dillion" and "Steve" to "get back here." After the 9-1-1 calls were played so that Heather could hear herself screaming at her sons, Defendant and Steve Jr., she admitted people went to Anthony's but still claimed Defendant was not there; rather, she was screaming at Dylan Guidry. She later admitted it may have been Defendant, as Dylan Guidry had never gone down to Anthony's.

Steve Jr., Defendant's brother, denied that he shot Silas and began to cry when asked whether Defendant had shot Silas. He did, however, place Defendant at the scene.

The Defendant and his girlfriend Courtney, were located the following morning at Courtney's mother's house. Initially Courtney stated that neither she nor Defendant were present when Silas was shot. Later she admitted that Defendant had dropped her off at her mother's house for a while.

Lieutenant Drew Leblanc with the Lafayette Parish Sheriff's Office interviewed Dylan Guidry, who stated that he saw Dillion Trahan shoot Silas Tate. Dylan Guidry's statement was consistent with Charlotte's. He stated that during the altercation he saw Dillion Trahan break from the group, go down the fence

3

line, get into his vehicle, pull down the street, stop his vehicle, step outside of it, take a shooter's stance, fire two rounds in the direction of Anthony's trailer, scream for his girlfriend to get in the car, and flee the scene.

Detective Leblanc testified Defendant became a suspect based on the consistent stories given by Charlotte Broussard and Dylan Guidry. Furthermore, according to the witnesses, the only person with a firearm that night was Defendant. The pathologist ruled out suicide; therefore, Silas Tate could not have possessed the gun that shot him. As a result, there was sufficient evidence to charge Defendant with the second-degree murder of Silas Tate.

Dr. Christoper Tape, a forensic pathologist, testified that the decedent's body had a gunshot wound in front of the external ear and right above the ear canal on the temple. Furthermore, there was no strippling that means it was not a close shot. Dr. Tape's testimony corroborates the testimony of Dylan Guidry who stated that Dillion Trahan shot Silas Tate and that Tate was shot in the head.

On September 7, 2017, a jury found Defendant guilty as charged. On September 14, 2017, Defendant was sentenced to life imprisonment without the benefit of probation, parole, or suspension of sentence, as required by La.R.S. 14:30.1. On December 11, 2017, Defendant appealed his conviction.

**ASSIGNMENT OF ERROR:**

In his sole assignment of error, Defendant argues "[t]he evidence adduced at trial was insufficient to support his conviction for second degree murder." Defendant's argument is essentially that the State's case is made up entirely of circumstantial evidence, and the State failed to exclude "several reasonable hypothes[e]s of innocence."

The analysis for a sufficiency claim is well settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Under La.R.S. 14:30.1, second degree murder is defined as the killing of a human being "when the offender has a specific intent to kill or to inflict great bodily harm." As the fourth circuit recently noted in *State v. White*, 14-397, p. 17 (La.App. 4 Cir. 7/29/15), 174 So.3d 177, 189, *writ denied*, 15-1577 (La. 10/10/16), 207 So.3d 408 (footnote omitted), "to prove second degree murder the state must prove the killing of a human being either with specific intent or when the offender is engaged in one of the listed crimes."

Defendant's argument is that he was convicted based mostly on circumstantial evidence as there was no direct evidence linking him to the shooting. There was no positive identification, no indication he had a gun, no gun residue test, and more importantly, no gun." We note that this argument fails to apply the *Jackson* standard of viewing the evidence in the light most favorable to the prosecution.

As noted above, "[i]t is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency

5

evaluations under the *Jackson* standard of review." *Id*. Detective Hiatt introduced the jury to Dylan Guidry's claim that he saw Defendant get out of his car, shoot twice towards Silas, then yell at his girlfriend to get in the car before speeding away from the scene. Furthermore, Dylan confirmed he made those statements to law enforcement at trial, though he recanted and claimed those statements were made under threats from law enforcement. It is clear that at some point Dylan Guidry lied about what happened the night Silas Tate was murdered. It was up to the jury to decide whether he was lying when he said Defendant committed the murder or when he claimed at trial that he never left the trailer and, therefore, had no idea who shot Silas.

We recognize that the State's case was based almost entirely on eyewitness testimony, namely the testimony of Charlotte Broussard and the recanted statement of Dylan Guidry, Defendant's brother-in-law. The testimony presented to the jury, primarily from Defendant's family, was inconsistent with prior statements given by themselves and with each other on various aspects. We find that in the light most favorable to the prosecution, the State proved its case beyond a reasonable doubt. As this court has previously noted regarding an eyewitness who gave different statements at different times:

> Clearly, the jury was made aware of the witness's lies but still found him credible regarding the offense. As the jurisprudence makes clear, a jury's credibility assessment is not to be second-guessed on appeal. This court has only a cold record to analyze, while the jury was able to view the witness's demeanor and hear the inflections in his voice.

*State v. Kato*, 12-1356, p. 6 (La.App. 3 Cir. 5/15/13), 157 So.3d 695, 700.

While the witness in *Kato* was a codefendant, the jury in the instant case was presented with an eyewitness, Dylan Guidry, who admitted to telling law enforcement that he saw Defendant get out of his car, shoot the victim, then drive away. Although Dylan returned at trial to his original story of having never gone

6

outside during the whole incident, "the jury was free to believe or not to believe all or part of [the witness's] testimony." *State v. Dugar*, 93-718, p. 13 (La.App. 3 Cir. 10/5/94), 643 So.2d 870, 878, *writ denied*, 94-2712 (La. 6/30/95), 657 So.2d 1019. As this court noted in *State v. Dyson*, 17-21, p. 4 (La.App. 3 Cir. 5/17/17), 220 So.3d 785, 789, "the supreme court has established that positive identification by one witness only is sufficient to support a conviction." Viewing the evidence in the light most favorable to the prosecution, we find that a rational jury could have decided Dylan was telling the truth when he identified Defendant as the shooter rather than when he testified at Defendant's trial. Given that Dylan's story at trial cannot be reconciled with Heather Trahan's testimony and 9-1-1 calls, it is reasonable for the jury to make such a decision on witness credibility.

We find that viewing the evidence in the light most favorable to the prosecution, Dylan Guidry's statement to law enforcement, which corroborates the information Charlotte Broussard gave to law enforcement, is sufficient to support Defendant's conviction for the second-degree murder of Silas Tate.

## CONCLUSION:

For the foregoing reasons, we affirm the trial court's September 7, 2017, conviction of Defendant for the charge of second degree murder.

**AFFIRMED.**