TERRI F. LOVE, Judge.
11 This appeal arises from the conviction and sentencing of defendant for the second degree murder of Brandon Baker. Defendant appeals contending that there was insufficient evidence to justify a conviction, that his 6th- Amendment rights were violated by the limited cross-examination of a witness, and that he was unable to review all of the evidence on appeal. For the following reasons, we find that sufficient evidence was presented to the jury to find that defendant murdered the victim beyond a reasonable doubt. We also find that defendant’s 6th. Amendment rights were not violated because the trial- court correctly limited the cross-examination of a witness, and that all evidence .was available for defendant’s review on appeal. According, the conviction is affirmed.
However, the record- lacks a ruling on the defendant’s motion to reconsider sentence. For this reason, we remand for a ruling on the motion, and the defendant’s appellate rights regarding his sentence are preserved.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Brandon Baker was sitting outside of his grandmother’s home in Hollygrove when he was shot and killed. Following the investigation, Garvin Scott was arrested for Brandon’s murder..
RMi".' Scott Was indicted and charged with second degree murder, La. R.S. 14:30.1. Mr. Scott appeared for his arraignment, and entered a plea of not guilty. Following a thrée-day jury trial, Mr. Scott was found guilty as charged.
. Mr. Scott filed motions for new trial and post-verdict judgment of. acquittal, which the trial court denied. , Mr. Scott announced his readiness for sentencing, and the trial court then sentenced him to life at hard labor without benefits. - Mr. Scott file a motion to reconsider, sentence, but there is no indication in the record that the trial court ruled on the- motion. Mr. Scott’s motion for appeal was granted.

TESTIMONY AND EVIDENCE

Lakisha Baker testified she is the mother of Brandon and Bernard Baker. She stated that Brandon, the deceased victim) was enrolled at Walter L. Cohen where he played football and received a football scholarship to McNeese. College. .She grew up in Hollygrove, and her -sons lived there when they were babies, but on the day in question she was visiting-her mother in Hollygrove. On April 20, 2012, Bernard was outside of her mother’s house with her brother, Raymond Baker, when she heard gunshots. Ms. Baker’s other son, Alfred came into the house declaring “[m]ama, they hit baby,” whom he later *301 described as “Brandon.” .She went outside the backdoor and found Brandon, shot, on the steps of a nearby house. Ms. Baker sat in the middle of the street, asked someone to call the ambulance, and held Brandon until the New Orleans Police Department (“NOPD”) arrived. Brandon died on the scene.
Ms. Baker attempted to assist Detective Tim Bender to resolve Brandon’s murder! Ms, Baker later learned that the intended target of the shooting was her other son, Bernard, who was in jail at the time of the shooting.
Ms. Baker identified Mr. Scott in the courtroom from previous court visits Rand stated he would wink at her and blow kisses, which made her uncomfortable. She stated her mother, Paula Baker, suffered a seizure earlier that morning on the way to court, and she did not want her brother, ■ Raymond, to testify because she was afraid of retaliation.
On cross-examination Ms. Baker revealed she, her mother, and other family members were involved with and convicted of distribution of drugs. She testified that Her mother was six to eight feet away from Brandon when he was shot, but her mother could not identify Mr. Scott.
Raymond Baker, Brandon’s uncle, testified that Brandon was not involved in a life of crime and was different than his brother Bernard. Mr. Baker stated he was approximately one hundred feet away from the scene, talking to a friend, when he heard about five to six gunshots. When he looked in the direction of the shots, he saw a man with “dreads,” wearing a red shirt and something covering his face, get into a gray Chevy HHR. Mr. Baker did not see the shooter’s, face.
Mr. Baker stated he knew of a group in Hollygrove who called themselves “Hell City” and he was 'familiar with Irving McKenzie, whom he believed to be related to Mr. Scott. Mr. Baker saw Mr. McKenzie circle the block approximately twenty minutes before the shooting. Brandon .questioned why he was “getting looks” from Mr. McKenzie. Mr. Baker stated witnesses would not come forward because they were afraid of retaliation.
Brittney Taitón, Mr. Scott’s girlfriend at the time of the murder, identified Mr. Scott in the courtroom. When she dated Mr. Scott, she drove a silver Chevy HHR. Ms. Taitón knew Mr. Scott as “Chris.” Ms. Taitón was dropped off at work by Mr. Scott at approximately 2:00 p.m. on April 20, 2012. Mr.- Scott then left in her vehicle. Mr. Scott was wearing a red shirt, blue jeans, and black and,red shoes.J^Ms. Taitón stated that while at work later that day, she received phone calls from people asking what was wrong with her vehicle and why was her vehicle on the news. Ms. Taitón then called Mr, Scott, who indicated that her vehicle was fine.
After beginning the. investigation, the NOPD visited Ms. Talton’s grandmother’s residence because the vehicle was registered to her grandmother,. The NOPD then went to the W Hotel where Ms. Tai-tón was working, Ms. Taitón went to the police station where she viewed portions of a video of the shooting. She identified her vehicle and Mr. Scott as the passenger in the vehicle.
When Ms. Taitón called Mr. Scott to inquire about her vehicle, he first told her it was fine, and then he told her the vehicle was stolen while he was playing basketball. While at the station, Mr. Scott called her, said he was in Kenner, told her that he found her vehicle, and texted a picture of . her vehicle on fire.
Ms. Taitón confessed to retracting her statement to Det. Bender when testifying to- the grand -jury because Mr. Scott learned that she was going to testify *302 against him and she was scared he would kill her. She also admitted to having committed perjury by doing so, which formed the basis for a case against her pending in another section of court.
Deputy Nicole Robertson, employed as a Patrol Deputy in the Fourth District of the Jefferson Parish Sheriffs Office, recalled, from her written statement, that she arrived at 8200 Airline Drive in Metairie, Louisiana at 11:08 p.m. on April 21, 2012, where she found the fire department extinguishing a vehicle on fire. She learned that the vehicle in question was involved in a murder. Dep. Robertson then turned the vehicle and case over to the NOPD.
Samantha Huber, the Chief Forensic Pathologist in the Orleans Parish Coroner’s Office, described the autopsy procedures. She authenticated the autopsy [(¡report she performed on Brandon.
Deputy Steven Keller testified that on April 20, 2012, he was employed by the NOPD, assigned to the Intelligence Division as a detective, and he assisted Det. Bender on the day of Brandon’s murder. Dep. Keller was familiar with Mr. McKenzie, Mr. Scott, and Brent a.k.a. “Flea” Collins. The three referred to themselves as “The Hell City Group.” Dep. Keller was also familiar with the Baker family.
Det. Bender testified that he has been employed with the NOPD since 1989 and was assigned as the lead investigator in Brandon’s death. When Det. Bender arrived at the scene, Brandon’s body was on the steps of an abandoned property. He identified photos of the crime scene, which included, but was not limited to, shell casings, the victim, and the address of the crime scene. Det. Bender secured video footage from the “J & P Superette,” located across the street from the scene. He identified bullets in a plastic bag that were taken out of Brandon's body during the autopsy. He also identified articles of Brandon’s clothing and a disk of the 9-1-1 calls.
Det. Bender learned that evening to whom the vehicle in the video was registered. Det. Bender went to the home of Ms. Talton’s grandmother who explained that the vehicle was registered to her, but that her granddaughter, Ms. Taitón, was in possession of it. He then went to Ms. Talton’s mother’s house. Ms. Talton’s mother was already aware that the vehicle was connected to a murder. She informed Det. Bender that Ms. Taitón lived in New Orleans East, and was working at the W Hotel.
Det. Bender picked Ms. Taitón up that evening from the W Hotel around 11:00 p.m., and he stated that she did not know why she was being picked up. Ms. | (¡Taitón was upset after viewing the video, but identified Mr. Scott in the passenger seat of the vehicle. Det. Bender stated that Ms. Taitón received calls on her cell phone from Mr. Scott during her interview. Ms. Taitón placed Mr. Scott on speaker phone as instructed by Det. Bender. Mr. Scott told Ms. Taitón he was in Kenner and that her vehicle had been stolen. Mr. Scott did not report the vehicle stolen to the police. While Ms. Taitón was speaking with Mr. Scott, Det. Bender received a call from the Jefferson Parish Dispatcher regarding the Chevy HHR. Once the vehicle was identified, it was towed to the evidence cage. Det. Bender later ended his interview with Ms. Taitón after discussing her possible relocation for her protection. Det. Bender located Mr. Scott a couple of months after the murder.
Garval Scott, Mr. Scott’s sister, knew Ms. Taitón to be Mr. Scott’s girlfriend and recognized her from a funeral and repast they attended together. She testified that Mr. McKenzie and Mr. Scott used to “be *303 together,” and “Hell City” referred to a complex or “scatter site,” not a gang.
Mr. Collins, nicknamed “Flea,” stated that he played basketball with Mr. Scott on April 20, 2012. Mr. Collins voluntarily went to the NOPD homicide department the day after the incident when he learned he was identified as a possible suspect on the news. He testified “Hell City” is a complex in Pigeon Town. Mr. Collins indicated that Mr. Scott was his best friend. Mr. Scott told him Ms. Talton’s vehicle was stolen on the day of the incident, and then Ms. Taitón called him and told him her vehicle was on the news. Mr. Collins also saw Ms. Taitón with Mr. Scott at a funeral months after the incident.

ERRORS PATENT

Mr. Scott filed a motion to reconsider sentence. There is no indication that |7the trial court ruled on the motion. The failure of a trial court to rule on a motion to reconsider sentence requires that the case be remanded for a ruling and that appellate review of Mr. Scott’s sentence be deferred. See State v. Peters, 10-0326 (La.App. 4 Cir. 2/16/11), 60 So.3d 672. Thus, we remand for a ruling on the motion to reconsider sentence.

SUFFICIENCY OF THE EVIDENCE

Mr. Scott asserts that the evidence was not sufficient to convict him. Mr. Scott maintains that there was no eyewitness testimony, nor was he identified as the shooter. Mr. Scott contends that the State was required to prove beyond a reasonable doubt that he specially intended to kill Brandon or inflict great bodily harm in light of La. R.S. 14:30.1.
' Mr. Scott avers that the State failed to meet its burden because it did not clearly identity Mr. Scott as the shooter, and because Ms. Talton’s testimony was unreliable. Mr. Scott maintains that the State could not solely rely on Ms; Talton’s identification of him'when she was not present at the time of the murder. Mr. Scott further asserts that Ms. Taitón identified him via video tape only by his clothing, which was in direct contrast of what the 9-1-1 caller reported. Mr. Scott maintains that Ms. Talton’s testimony reveals that she did not see his face on the video; she was worried she was going to get in trouble because her vehicle was used in the murder; and she changed her testimony after she was arrested and charged with perjury.
Mr. Scott claims that Be professed his innocence and unwaiveringly maintained that Ms. Talton’s vehicle was stolen.’ Mr. Scott contends that the jury failed to consider other reasonable scenarios such as: the person who stole the vehicle committed the crime; Ms. Talton’s identification of Mr. Scott wasjjincorrect; Ms. Taitón was angry when she first identified Mr. Scott; or Det. Bender ignored the 9-1-1- caller’s description because implicating Mr. Scott was easier.
The State contends that it established beyond a reasonable doubt undeniable facts that were crucial in identifying Mr. Scott. The State references the evidence that Ms. Taitón was dropped off by Mr. Scott in her-vehicle prior to the murder; her vehicle was used in the shooting; Ms. Talton’s identification of Mr. Scott; Mr. Baker’s description of the shooter matched the video and Ms. Talton’s description; Ms. Talton’s vehicle was burned and -Mr. Scott was at the scene but never reported the vehicle as stolen; Bernard was suspected of shooting Mr. McKenzie, who was circling the scene prior to the shooting; and Mr. Scott was at-large for four months after the murder took place.
 As the Louisiana Supreme Court stated in State v. Bolden, 11-2435, p. 2 *304 (La.10/26/12), 108 So.3d 1159, 1161, review of the sufficiency of the evidence under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), mandates a review .of all of the evidence introduced at trial, inadmissible as well as admissible evidence.
When the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial ... but is not entitled to an acquittal even if the admissible evidence, considered. alone, was insufficient.
State v. Hearold, 603 So.2d 731, 734 (La.1992). Further,, the Louisiana Supreme Court set forth the standard for evaluating a claim of insufficient evidence in State v. Brown, 03-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate' court “must déter-mine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Neal, [20]00-0674, (La.6/29/01) 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).
When circumstantial evidence is used to prove the commission of the offense. La. R.S. 15:438 requires that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence”. Neal, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be suffi- . dent under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Id. (citing State v. Rosiere, 488 So.2d 965, 968 (La.1986)).
“If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all of the evidence most favorable to the prosecution must be adopted.” State v. Green, 588 So.2d 757, 758 (La.App. 4th Cir.10/29/91). “It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence.” State v. Johnson, 619 So.2d 1102, 1109 (La.App. 4th Cir.1993). “[C]redibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the” fact finder. State v. Brumfield, 93-2404 (La.App. 4 Cir. 6/15/94), 639 So.2d 312, 316. Moreover, “[c]onflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency.” State v. Jones, 537 So.2d 1244, 1249 (La.App. 4th Cir.1989). “Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness’s testimony, if believed by the fact finder, is sufficient to support a factual conclusion.” State v. Marshall, 04-3139, p. 9 (La.11/29/06), 943 So.2d 362, 369.
“[T]o prove second degree murder the state must prove the killing of a human being either with specific intent or when the offender is engaged in one of Imthe listed crimes.”[1] State v. White, 14- *305 0397, p. 17 (La.App. 4 Cir. 7/29/15), 174 So.3d 177, 189. “In addition to proving the statutory elements of the charged offense at trial, the state is required to prove a defendant’s identity as the perpetrator.” State v. Page, 08-531, p. 6 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 447. “Where the key issue is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof.” White, 14-0397, pp. 18-19, 174 So.3d at 189.
The evidence presented was sufficient to infer from the circumstances that Mr. Scott specifically intended to kill Brandon. Trial testimony established that Mr. Scott was a passenger in the vehicle via Ms. Talton’s testimony. The vehicle was later associated with Ms. Taitón, Mr. Scott’s ex-girlfriend. This vehicle circled the block just prior to the murder, and Brandon indicated to Mr. Baker that the driver glared at him. Ms. Taitón identified her vehicle and Mr. Scott from video footage taken across the street from the murder. Any rational trier of fact could conclude that all of the elements of second degree murder were proven beyond a reasonable doubt. Also, the State herein was able to negate any reasonable probability of mis-identification by indicating that the 9-1-1-caller’s report is often skewed by the excitement of the event. Further, Mr. Baker’s description of Mr. h, Scott and Ms. Talton’s identification of Mr. Scott from the video the day of the incident alleviates doubt. As such, we find no merit to the assertion that there was insufficient evidence to justify a conviction.

LIMITED CROSS-EXAMINATION

Mr. Scott next contends that his Due Process rights were violated because the trial court limited the cross-examination of Ms. Taitón.
Mr. Scott sought to elicit testimony from Ms. Taitón about other men she may have been involved with who also possessed keys to her vehicle. The trial court ruled that the line of questioning was irrelevant, and Mr. Scott proffered the questions. However, on appeal, Mr. Scott asserts that the testimony was - relevant, because Ms. Taitón was allegedly dating another man named “Chris.” He avers that although she referred to Mr. Scott -as “Chris,” it is possible that another Chris stole Ms. Tal-ton’s vehicle while Mr. Scott was playing basketball on April, 20,2012.
The State maintains that Ms. Taitón admitted to knowing another man named Chris, and the trial'court stopped Mr. Scott from prying into her personal life in an attempt to tarnish her character and discover the location of her new residence. The State also asserts that excluding the *306 testimony was harmless because the testimony of Det. Bender, as well as Ms. Tai-tón, made it abundantly clear that the “Chris” she was referring to was indeed Mr. Scott.
This Court set forth the applicable law concerning a criminal defendant’s right to confront and cross-examine witnesses in State v. Rubens, 10-1114, p. 44 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, 59, quoting State v. Huckabay, 00-1082, pp. 25-26 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1108:
An accused is entitled to confront and cross | ^examine the witnesses against him. La. Const, art. 1, § 16. La. C.E. art. 611(B) provides that a witness may be cross-examined on any matter relevant to any issue in the case. Due process affords a defendant the right of full confrontation and cross examination of the State’s witnesses. State v. Van Winkle, 94-0947, p. 5 (La.6/30/95), 658 So.2d 198, 201-202. The trial court has the discretionary power to control the extent of the examination of witnesses as long as the court does not deprive the defendant of his right to effective cross-examination. State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473; State v. Robinson, 99-2236, p. 6 (La.App. 4 Cir. 11/29/00), 772 So.2d 966, 971. It has been held that evidentiary rules may not supercede [sic] the fundamental right to present a defense. Id. However, evidence may be excluded if it is irrelevant. See State v. Casey, 99-0023, pp. 18-19 (La.1/26/00), 775 So.2d 1022, 1037. Further, confrontation errors are subject to the harmless error analysis so the verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial was surely unattributable to the error. State v. Broadway, 96-2659, p. 24 (La.10/19/99), 753 So.2d 801, 817.
The trial court herein stated: “There is no indication about any other boyfriend related to Ms. Taitón who is alleged, or accused of doing anything in this case. So this is irrelevant.”
The State correctly relied on State v. Edgar, 12-0744, pp. 17-18 (La.App. 4 Cir. 9/18/13), 140 So.3d 22, 34-35, wherein this Court reiterated reasoning from State v. Draughn, 05-1825, pp. 47-48 (La.1/17/07), 950 So.2d 583, 615-16:
“The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.” State v. Robinson, 2001-0273, p. 6 (La.5/17/02), 817 So.2d 1131, 1135, citing Davis v. Alaska, 415 U.S. 308, 315-316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (internal citation omitted). Cross-examination has been termed “the principal means by which believability and truthfulness of testimony are tested.” Robinson, 2001-0273, p. 6, 817 So.2d at 1135.
Under the code of evidence, “a witness may be cross-examined on any matter relevant to any issue in the case, including credibility.” La. C.E. art. 611(B). The trial court is empowered to exercise reasonable control llover the manner of cross-examination so as to (1) ensure the effectiveness of the interrogation as a mode of ascertaining the truth; (2) avoid the needless consumption of time; and (3) protect witnesses from harassment or undue embarrassment. La. C.E. art. 611(A). “Subject to the discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, or discredit, the witness.” Robinson, 2001-0273, p. 6, 817 So.2d at 1135. The *307 ruling of the trial court as to the scope and extent of cross-examination should not be disturbed absent an abuse of the court’s broad discretion. State v. Irish, 2000-2086, p. 7 (La.1/15/02), 807 So.2d 208, 213, cert. denied, 537 U.S. 846, 123 S.Ct. 185, 154 L.Ed.2d 73 (2002); State v. Frost, 1997-1771 p. 32 (La.12/1/98), 727 So.2d 417, 439, cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999).
It is clear from the evidence, together with Ms. Talton’s testimony that “Chris” was Mr. Scott. Ms. Taitón knowing another Chris does not alone negate that Mr. Scott was the perpetrator. The trial court exercised reasonable control in limiting the cross-examination of Ms. Taitón when there was no relevance to the line of questioning and it could have led to wasting time and possibly embarrassing Ms. Tai-tón. See La. C.E. art. 403. Accordingly, we find that the trial court did not abuse its discretion.

EVIDENCE REVIEW ON APPEAL

Mr. Scott contends that the record on appeal was incomplete, and therefore this Court could not thoroughly review his appeal. However, this Court ordered the State to submit the surveillance footage, the 9-1-1-incident recall log, and Mr. Scott’s arrest warrant in compliance with Local Rule 24.
In a supplemental brief filed by Mr. Scott, he acquiesced that the 9-1-1 incident recall log and the arrest warrant did not contain an appealable issue, but he asserts that the surveillance footage cannot be clearly seen, and there is no way Mr. luScott could be positively identified from the footage. The contention overlaps with Mr. Scott’s sufficiency of the evidence issue that is analyzed in the first assignment of error.
Counsel for Mr. Scott further avers that she could not access the jailhouse recordings because of formatting issues and/or wifi connectivity problems.
La. Const, art. I, § 19 provides that “[n]o person shall be subjected to imprisonment ... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based.” In felony cases, the recording of “all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel” is statutorily required. La. Code Crim. Proc. art. 843; see also State v. Landry, 97-0499, p. 3 (La.6/29/99), 751 So.2d 214, 215 (criminal defendant has a right to a complete transcript of his trial proceedings, particularly where appellate counsel on appeal was not also trial counsel). However, to justify reversal of a conviction and the ordering of a new trial, an omission from the trial record must affect the “substantial rights of the accused.” La. Code Crim. Proc, art 921. Thus, even though it may be reversible error when material portions of the trial record are unavailable or incomplete, a “slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal” does not require reversal of a conviction. State v. Campbell, 2006-0286, p. 99 (La.5/21/08), 983 So.2d 810, 872 (citations omitted). In some circumstances, an incomplete record may be adequate for appellate review and, therefore, a defendant is not entitled to relief on the basis of an incomplete record absent a showing that he was prejudiced by the missing portions of the record. Campbell, 2006-0286, p. 99, 983 So.2d at 872-873 (citations omitted).
*308 State v. Diaz, 15-0354, p. 9-10 (La.App. 4 Cir. 12/16/15), 183 So.3d 674, 680.
In the jailhouse telephone calls, Mr. Scott discusses clothing for an upcoming court appearance; money to pay his attorney; a recent neighborhood shooting; the possibility of a plea deal; and his lawyer’s tactics. Mr. Scott’s | ^counsel’s .failure to be able to access the CD in the record does not affect his substantial rights. This Court also notes that it had no problem listening to the telephone calls. As such, we find that Mr. -Scott’s assignment of error lacks merit.

DECREE

For the above-mentioned reasons, we find that sufficient evidence was presented to the jury to convict Mr. Scott of murdering Brandon. Additionally, we do not find that Mr. Scott’s 6th Amendment rights were violated when the trial court limited the cross-examination of Ms. Taitón based on relevancy. Mr. Scott’s right to appellate review was not impacted.' Therefore, we affirm Mr. Scott’s conviction. However, having found an error patent regarding Mr. Scott’s sentence due to the lack of an indication of the trial court’s ruling on Mr. Scott’s motion to reconsider sentence, we remand the matter to the trial court for a ruling thereon. Appellate review of Mr. Scott’s sentence is deferred.
CONVICTION AFFIRMED; REMANDED

. La. R.S. 14:30.1 states:
Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of *305 aggravated or first degree rape, forcible or second degree rape, aggravated arson, ag-graváted burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm. (3)When file offender unlawfully distributes or dispenses a controlled dangerous substance listed in Schedules I through V of the Uniform Controlled Dangerous Substances Law,(footnote omitted) or any combination thereof, which is the direct cause of the death of the recipient who ingested or consumed the controlled dangerous substance. (4) When the offender unlawfully distributes or dispenses a controlled dangerous substance listed in Schedules I through V pf the Uniform Controlled Dangerous Substances Law, or any combination thereof, to‘another who subsequently distributes or dispenses such controlled dangerous substance which is the direct cause of .the death of the person who ingested or consumed the controlled dangerous substance.