JAMES F. MCKAY III, CHIEF JUDGE
| defendant, Mark Luzzo, appeals his conviction and sentence for manslaughter. For the reasons set forth below, we affirm.
STATEMENT OF THE CASE
Defendant was charged by grand jury indictment on June 14, 2012, with second degree murder, a violation of La. R.S. 14:30.1; he pled not guilty. Defendant was found incompetent to proceed at the conclusion of a July 31, 2012 competency hearing. Thereafter, defendant was found competent to proceed at-the conclusion of an April 16,2013 competency hearing.
The trial court denied defendant’s motions to suppress the statements and evidence. The defendant’s motion in limine to exclude as privileged his statement to a non-clergy member of a Methodist church was also denied. Defendant sought review of that ruling in this Court on September 19, 2014, but this Court declined to exercise its supervisory jurisdiction.[1]
Defendant was found competent to proceed on June 4, 2015, at the conclusion of a lunacy hearing. Defendant proceeded to trial by a twelve-person jury on July 28-31, 2015. He was found guilty of manslaughter under La. R.S. |¾14:31, for the February 20-21, 2012 beating death of Conrad Blanchard. Defendant’s motion for new trial and for post-verdict judgment of acquittal were denied. After waiving delays, defendant was sentenced to serve thirty years at hard labor. Defendant’s appeal followed.
STATEMENT OF FACTS
Lechia Powell, a New Orleans Police Department (NOPD) 911 operator, identified State Exhibits 1 and 2, respectively, as a CD of a 911 call under NOPD Item #B-31091-12 and a 911 incident recall under that same item number. She said the call came in at 8:21 a.m. on February 21, 2012, as an unclassified death, at 914 N. Rocheblave Street. The caller was identified as “Mark.” Ms. Powell confirmed that the 911 call, which was played for the jury, reflected that defendant called the police to report the death of his friend, reporting that his friend had gotten into a fight the previous night and sustained some cuts to his head.
NOPD Detective Nathan Gex testified that he investigated the unclassified death in question on February 21, 2012. He said he arrived on the scene between 8:00 and 8:30 a.m., whereupon he met with defendant. Defendant was not a suspect at the time. As he walked through the front door, he could see the victim lying on the floor in the second room with his feet protruding into the hallway. He inspected the body and then walked through the rest of the residence to see if anyone else was present or whether there was any evidence in plain view. He noticed a droplet of blood in the kitchen area and some damp clothing on top of the washer and dryer in the adjoining laundry room, including two towels that appeared they might be tinted with blood.
Det. Gex confirmed that he had NOPD Crime Scene Technician Erin Stewart come to the residence to analyze the crime scene. The towels were |scollected at his direction. He identified a package containing at least one of them as State Exhibit 3.
*58 Det.- Gex noticed that the victim had obvious signs of trauma to his face and eye area. The detective testified that with unclassified deaths, he calls “crime scene” to document the location and position of the body and things of that nature. He also called the Coroner’s Office. Det. Gex identified State Exhibits 4 and 5, respectively, as a CD of the crime scene photographs and the photos themselves. He identified one photo of a droplet of blood. on the kitchen floor and what appeared to be blood spatter residue on the kitchen cabinet door. The victim was on his back, covered with a red blanket up to his neck. Photos depicted lacerations to the victim’s face and left eye area. Defendant told the detective the victim arrived at the residence the prior evening around 8:00 or 9:00 p.m. in that condition. Defendant did not call the police until the following day, which was Mardi Gras Day. Det. Gex said the coroner classified the death as unclassified pending an autopsy to be conducted the following day.
Det. Gex testified on cross examination that defendant said the victim was intoxicated when he arrived the prior night, already beaten. He helped the victim change clothes, cleaned blood off the victim, and helped him lie down on the floor. Defendant gave him a pillow and covered him with a blanket. Thereafter, defendant washed the victim’s bloody clothes in the washing machine.
Det. Gex also stated on cross examination that he thought what defendant said was that when he woke up the next morning he discovered the victim was deceased. Det. Gex confirmed that the only sign of obvious trauma was to the victim’s face. He thought the .wounds to the face appeared to be fresh, confirming they had likely been sustained the night before. Det. Gex confirmed that he did not |4see blood in the bathroom or in the bedroom. The detective did not believe that what he thought was blood spatter on the cabinet area was ever collected by a crime scene tech or that it was ever tested. He had no knowledge of a swab from the blood on the kitchen floor ever being tested or analyzed. Det. Gex testified that he did not smell any strong cleaning agents, but he did notice some cleaning supplies at the rear door of the residence. No crime scene photo was taken of that. He stated that he saw no signs of a struggle in the apartment, and that defendant had no signs of injury.
Det. Gex explained that he did not arrest defendant that day because he had no reason to do so at that point. He further confirmed that at some point he' spoke with defendant again, and defendant said something about the victim being beaten up by someone he recalled was named “Kulio,” who frequented the Woldenberg Park, French Quarter area. The detective said he believed NOPD Homicide Det. Elizabeth Garcia located someone by that name, who was confined to a wheelchair.
Dr. Samantha Huber, who performed the autopsy on the victim, identified her autopsy protocol (report) as State Exhibit 6. She confirmed that the cause of the victim’s déath was blunt-force injuries. She viewed a crime scene photo and pointed out a laceration above the victim’s left eye with a contusion around it, another laceration below the same eye, and a bruise or contusion on the closed eyelid. She said these were the only injuries to the victim’s head. She said there was “fresh hemorrhage” under the scalp, at least around one laceration, apparently referring to the one above the left eye, the larger of the two lacerations. Dr. Huber stated that this hemorrhage underneath the scalp was a more recent injury and did not occur “the day before,” presumably meaning the day before death.
*59 |fiDr. Huber found an abrasion/scrape on the back of the victim’s shoulder, and confusions on the front and sides of his upper arms, and also on his left elbow. There were bruises around the victim’s knees. She said they were all fresh injuries—as opposed to older ones, some of which he also had. She testified that the victim had contusions on his small bowel/intestines, but those did not show up on the skin of the abdomen. Similarly, the victim had a broken rib on his left back, with hemorrhage beneath the skin in that area, although there was no outer bruising. Associated with that broken rib, the victim had a five and one-half inch laceration in his spleen, approximately one centimeter deep. His torn spleen hemorrhaged more than two liters of blood into the abdominal cavity. She said that “would have been more of the fatal wound.” She recommended that the coroner classify the death as a homicide.
When Dr. Huber was asked whether the victim’s injuries were consistent with him having been kicked repeatedly on the left side of his torso, Dr. Huber stated that it was possible, but that she had no “pattern injuries” indicating that this had been a “kicking” as opposed to a “beating”. Dr. Huber testified generally that it could have taken minutes to a few hours for a person to die from a ruptured spleen. However, she did not believe it took a few hours with the victim because he had cirrhosis of the liver, which, she said, causes one to bleed easier. But she also said that this did not mean the victim could not have had a small laceration in his spleen that over time became larger. She said it was possible it could have taken a few hours for the victim to die in such a case.
Dr. Huber testified that there would be a fair amount of pain, especially as the abdomen filled with blood, noting that two liters had bled out from the ruptured spleen. She also said that the rib fracture would have been painful. When asked Labout the possibility that the victim would have been able to walk two miles to defendant’s residence, given his condition, she said it would not have been impossible, but was probably unlikely. She said the victim’s head injury would have been consistent with striking it on a cabinet, but she said the recessed injury on the eye could have been from a punch or kick. She said she would expect there would have been a fair amount of bleeding from the head lacerations, especially as large and deep as they were. She noted that the victim had dried blood in his hair.. She said a toxicology report showed no illicit drugs in the victim’s system, just an anti-psychotic medication, a sleep aid she identified as Remeron, nicotine, and caffeine.
Dr. Huber saw no recent injuries on the victim’s hands. She first said she saw no defensive wounds, but then stated it was possible that some of the contusions on the victim’s upper arms were defensive in' nature, explaining that if he was being kicked or punched, he could have been pulling his arm back to block blows and protect his ribs. She confirmed this would have been consistent with the victim being on the ground and being kickéd. When asked whether the ruptured spleen would necessarily have- been fatal had there been any medical intervention, Dr. Huber stated that the victim could have had his spleen surgically removed. She noted that people lacerate their spleens in motor vehicle accidents and get to a hospital, where generally the spleen will be removed.
Dr. Huber confirmed on cross examination that the victim was five feet eight inches tall and weighed one hundred and forty-three pounds. She confirmed that, initially, a person could walk after sustaining the type of spleen injury suffered by the victim—at least until the pain got to *60 the point where the person would have to sit down, and also depending on how fast the person started to bleed out. She | yopined that a person could have walked six or seven blocks. She stated that it would have required “quite a force or several instances of force in the same spot to have caused a laceration of the spleen.” She noted that with the victim in the present case, because he had a bleeding disorder from cirrhosis of the liver, most likely his spleen would have ruptured “a little bit easier.”
Dr. Huber also confirmed on cross examination that the coroner’s records reflected that the victim had been lying in the same position for some time. She stated that the coroner’s office representative arrived at the scene around 8:00 or 8:15 a.m., and she confirmed that the time of death had most likely been “the night before.” She had no reason to believe the lacerations to the victim’s head had not been inflicted at the same time as the laceration to his spleen. Dr. Huber confirmed that, in addition to the confirmed toxicology findings in defendant’s blood of nicotine, caffeine, an anti-psychotic, Se-roquel, and the sleep aid, Remeron, there were presumptive positive findings for benzodiazepine and cannabinoids.
Dr. Huber confirmed on redirect examination that she did not “see any pattern injury,” so she saw no footprint or shoe print. When asked whether the injuries were consistent with someone having been kicked multiple times, she replied: ‘Tes, it’s possible he could have been kicked or hit.” She said the blunt-force injury that caused the lacerated spleen was consistent with the victim having been kicked multiple times. As to the victim bleeding from his head lacerations, she stated that she believed those lacerations had been cleaned up. Dr. Huber stated on re-cross examination that she did not see any evidence that the victim was suffering from cancer.[2]
IsHomicide Detective Elizabeth Garcia testified that she received the case when NOPD was notified by the Coroner’s Office that the victim’s death had been reclassified as a homicide. She obtained a search warrant for defendant’s residence, which she and Detective Jacob Lundy executed on February 23, 2012. She telephoned defendant to advise him of the warrant, and defendant met the detectives at the residence. Defendant appeared to be intoxicated. Det. Lundy tried to speak with defendant, but thereafter terminated the interview. Det. Garcia said she made the decision not to interview defendant because of his level of intoxication.
Photographs were taken of the interior of the residence, defendant himself, and his hands. NOPD Officer Troy Dickerson sprayed different areas of the residence with a blood-highlighting substance known as “LCV.” Det. Garcia testified that some traces of blood were found in the kitchen. She said samples of that blood were collected as evidence but were never tested. Det. Garcia testified that because Det. Gex was informed that the victim had shown up at defendant’s residence bleeding profusely from the face and head, she had the threshold area of the front door home sprayed for blood traces. No blood was found on the threshold, porch, or step areas. Det. Garcia also confirmed that no traces of blood were found in the bedroom (where the victim’s body was located) or anywhere else in the residence except for the kitchen. She did not notice the smell of *61 any cleaning agents inside defendant’s residence. Det. Garcia stated that she saw no evidence of an altercation having occurred in defendant’s residence and no physical injuries to defendant’s face, hands or to his body.
Det. Garcia testified that defendant met her at her office the following day. Defendant did not appear to be intoxicated at that time. He reported having one 1 ndrink hours before the interview. Det. Garcia initially testified that defendant had advised that he was not on any medications at the time of the interview. After having her memory refreshed, she stated that defendant was on HIV medications and psychotropic medications. Defendant reported that he sometimes had problems thinking through things. He reported that he completed the eighth grade. Det. Garcia did not observe any mental incapacity in defendant while he was giving his statement to her. She read defendant his Miranda rights, which defendant understood, and presented him with a waiver of rights form, which she identified as State Exhibit 10. Defendant signed the form, waving his Fifth Amendment rights and agreeing to speak with the police.
Det. Garcia testified that defendant related that he and the victim were in the apartment, and as it was getting dark, the victim told him he was “going to the store for credit,” meaning that he was going to purchase cocaine. The defendant explained that the victim had a drug abuse problem. Later that evening, defendant later answered a knock on the door to find the victim bleeding profusely and stating that he had been jumped or robbed. Defendant stated that he helped clean up the victim and gave him clean clothes. He then set the victim up with a blanket and pillow and went to sleep between 8:00 and 9:00 p.m. The next morning, defendant found the victim unresponsive.
Defendant did not provide Det. Garcia with the name of the person who beat the victim. However, Det. Garcia was informed by Det. Gex that one Ronald “Kulio” Harris was alleged to have been that person. Det. Garcia said Kulio played drums in Woldenberg Park, on the Mississippi River. Det. Garcia ascertained that Kulio had been in the hospital on the day the victim was injured. Det. Garcia testified that the police looked at a lot of video surveillance footage lipfrom the area of Woldenberg Park from the time the victim would have allegedly been beaten, but did not find anything. She noted that day, Monday, had been “Lundy Gras,” the day before Mardi Gras, and it would have been very crowded. Det. Garcia testified that Woldenberg Park was approximately two miles from defendant’s home.
Det. Garcia testified that she did not believe defendant’s statements as to what happened that night were corroborated by the evidence. Notably, defendant said the victim came in bleeding profusely, but no blood was found anywhere near the front entrance. She also testified that defendant had given the initial responding officers “a couple of different stories,” and then he gave her “a couple of different stories and it just didn’t seem logical” in light of the physical evidence or lack thereof. However, she did not feel she had enough to obtain an arrest warrant at that time.
Det. Garcia noted that with defendant’s permission, she collected the victim’s brown Timberland boots on the day after she interviewed defendant at her office. She noted that the victim was not wearing shoes when authorities responded to the call. Det. Garcia testified that she did not observe any blood on the boots. On cross examination, however, Det. Garcia stated that she could not definitively tell if the boots had blood on them because they were never tested. She also acknowledged *62 that she stated in her report that the boots were “stained with possible blood,”
Det. Garcia identified two pairs of shoes that were seized. The first was State Exhibit 11, a pair of men’s Timberland Pro Series steel-toe‘ boots, size eight medium. Det. Garcia could not definitively say to whom these boots belonged. She identified State Exhibit 12 as a pair of white New Balance tennis shoes, size hiten and a half. These tennis shoes were collected by Det. Lundy at Central Lockup. Det. Garcia confirmed on cross examination that she believed defendant had been wearing those tennis shoes at the time he was arrested.
Det. Garcia admitted on cross examination that she could not recall whether Det. Lundy, who was with her when she executed the search warrant at defendant’s residence, was present when defendant gave his recorded statement at NOPD headquarters. She agreed that to her knowledge defendant did not tell Det. Lundy anything at defendant’s residence before Det. Lundy terminated the interview because of defendant’s intoxicated state. Det. Garcia confirmed that defendant told the 911 operator pretty much the same thing he told her. She further confirmed that defendant told Det. Gex pretty much the same thing he told her. After further refreshing her memory on cross examination, Det. Garcia admitted that defendant told her in his statement that the victim had gotten into a fight and broken some ribs in Jackson Square on February 19, 2012, the Sunday before Mardi Gras. Det. Garcia later explained that defendant said he was confused about whether that incident happened on Sunday or Monday.
Det. Garcia confirmed that, although defendant told her that the victim had blood on his clothes, she never had the victim’s clothes or towels seized by Det. Gex tested. She also confirmed that scrapings were taken during the autopsy from the victim’s fingernails, or the actual fingernails or pieces therefrom. She did not have that evidence tested. Det. Garcia testified that when she asked defendant if he was responsible in any way for the death of the victim, defendant stated that he was not.
On redirect examination, Det. Garcia testified that defendant did not indicate to her what shoes the victim was wearing when arrived back at defendant’s 112residence, and, in fact, defendant said “I don’t know,” when asked about that. Det. Garcia further confirmed on re-cross examination that, while defendant said in his statement to her that he did not know what shoes the victim was wearing when he came home injured and bleeding, he later indicated in his statement that the victim had been wearing the steel-toed boots.
NOPD Sergeant Troy Dickerson testified that on February 23, 2012, in connection with the search warrant, he processed areas near the entrance to 914 N. Roche-blave St., as well as the laundry room area, by spraying them with a chemical that highlights a presumptive positive result for the presence of blood. Sgt. Dickerson testified that it is possible to remove blood by using any type of household cleaning agent, such as bleach. He said the location on the kitchen floor where the droplet of blood had been swabbed by the crime scene technician was positive for blood. Nothing showed up in his spraying of the entryway of the home, the porch, the front living room, the bedroom, or the laundry room. He also sprayed “some shoes” located in a room, but presumably nothing showed up on the shoes either.
Sgt. Dickerson confirmed on cross examination that even if a surface has been cleaned, if it has not been fully cleaned, the LCV spray will highlight a blood stain. He confirmed that he found no large streaks of blood or smears of blood anywhere on *63 the kitchen floor. He farther stated that the kitchen cabinet was sprayed, but it did not give him a presumptive positive reaction. He also confirmed that the shoes he sprayed were not boots. Sgt. Dickerson confirmed that when he went through the house, he did not see any signs of violence or that a struggle had occurred. He saw no signs of recent cleaning of the house.
11sSgt. Dickerson was asked on redirect examination to view photos S-5(Q) and S-5(R), photos previously identified as taken by a crime lab technician on the first day police officers came to the scene. Sgt. Dickerson identified the photos as depicting the blood droplet on the kitchen floor. When asked by the prosecutor if he saw any other blood in that photo, he stated that there appeared to be a stain on the grout itself. He recalled that those two stains were the only ones he saw. When asked whether there was any way for him to determine if something had been cleaned, he said there were too many variables for him to make such a determination.
Brett Buck testified that he worked “very part time” at Tulane University School of Medicine and also at St. Mark’s United Methodist Church, where he worked in “congregational care” with the homeless and also with “the partners in ministry who provide the meals each week.” Mr. Buck was also a volunteer with Project Lazarus, delivering meals.
Mr. Buck stated that in February 2012, the pastor of St. Mark’s, Anita Dinwiddie, asked him to speak with defendant. She explained that defendant was distraught because his partner had been murdered. He met defendant at St. Mark’s Church on the Sunday after Mardi Gras. Defendant told Mr. Buck that the victim had been home but had gone to Woldenberg Park and returned all beaten up. Defendant told Mr. Buck that he had washed the victim’s clothes and then put them back on him. He then wrapped the victim in a blanket and laid him on the floor.
Mr. Buck gave defendant his card, and told defendant he was welcome to call if he needed to talk further. Mr. Buck said defendant called him the following | uafternoon, crying and upset, asking if they could talk. Defendant said he wanted to come to Mr. Buck’s home, so they could talk in private.
Mr. Buck testified that when defendant came over, he appeared intoxicated, and defendant asked him if he had anything to drink. He gave defendant a small amount of Crown Royal. He said they talked about the victim, and defendant very quickly began telling him that the night the victim died they got into a fight in the kitchen. Defendant related that he grabbed the victim by the collar of his shirt and was going to try to slam him to the floor, but the victim’s head hit the counter, causing a gash that bled everywhere. Defendant told him that when the victim fell to the floor, he began to kick him. Defendant told Mr. Buck that he was very angry and continued to kick the victim in the abdominal area until he stopped moving.
Defendant told Mr. Buck that he believed the police were on to him because there was no blood outside the residence, and that Det. Garcia believed the victim had been beaten inside the residence.
Defendant gave Mr. Buck some names and telephone numbers of people, and he asked Mr. Buck to contact the people and tell them he was not a monster and that he did not mean to do this. Defendant stated that he would eventually turn himself in. Mr. Buck told defendant that he could give him until 2:00 p.m. the following day to do so. If not, Mr. Buck was going to call Det. Garcia. He telephoned defendant the next morning; defendant had not turned him *64 self in. At 2:00 p.m., Mr. Buck called Det. Garcia and left a message. He stated that Det. Garcia and another detective came to his residence to interview him. Mr. Buck freely and voluntarily told the detectives everything he knew.
hfiMr. Buck confirmed that defendant did not tell him what the argument and fight had been about. Mr. Buck was played a portion of his (Mr. Buck’s) statement, and in that portion he did not tell Det. Garcia that the victim hit his head on the counter. He explained that defendant told him the victim was not moving after the fight. Defendant thought the victim was just sleeping. After listening to his recorded statement to the police, Mr. Buck acknowledged that he apparently never told the police that defendant kicked the victim in the abdomen. Mr. Buck stated that, although defendant told him that he cleaned up the victim’s blood, he did not recall defendant telling him how he had done so.
Mr. Buck further confirmed on cross examination that defendant told him he did not call 911 because he was afraid of going to jail, and he was panicked and did not know what to do. Defendant said those things at the same time he told Mr. Buck that he was going to turn himself in, but was just waiting for the right time to do so. Mi*. Buck stated he was not aware of any drugs or medication defendant might have taken before defendant came to his house to speak with him. He explained that defendant was crying and very distraught the entire time they spoke. The State rested its case in chief at the conclusion of Mr. Buck’s testimony.
Dr. Sarah Deland, qualified by joint stipulation as an expert in forensic psychiatry, testified that she interviewed defendant four times. She said that each of the four interviews lasted from forty-five minutes to two hours. She also reviewed some of the legal documents relating to this case, as well as medical records from the LSU healthcare system, University Hospital Emergency Room, LSU Psychiatric Services, LSU HIV Treatment Clinic, where defendant received ongoing treatment, and from East Louisiana Mental Health System, the forensic hospital in which defendant had earlier been placed when found incompetent to 1^proceed to trial. She identified Defense Exhibit 2 as those records. These records reflected defendant’s treatment for mental illness in this state as early as 1998. Defendant’s patient history in some of those records reflected his mental health treatment prior to 1998 in New Jersey, where he was from originally.
Dr. Deland testified that some of defendant’s diagnoses over the years included major depressive disorder, bipolar disorder, schizoaffective disorder, schizophrenia, post-traumatic stress disorder (PTSD), substance abuse, cluster “B” personality trait, borderline personality, as well as traumatic brain injury and related issues, cognitive disorder, and borderline intellectual functioning to low average intellectual functioning. She did not believe defendant was malingering. She said defendant had a history of substance abuse dating to his preteen years. She said alcohol had been a constant for defendant, but he had also indulged in cocaine, methamphetamine, marijuana and other drugs over the years. She said the substance abuse had caused him a lot of problems and had exacerbated his mental illness. She noted that his hospital records reflected admissions with significant blood alcohol levels and documented instability. She noted that during one of defendant’s hospitalizations, a radiologist read a CAT scan of defendant’s brain to give an impression of chronic progressive encephalo-malacia, or chronic progressive brain damage, mentioning that this can be related to *65 serious alcoholism. Defendant reported a brain injury from his late teens, where he was hit by a car and was in a coma for a while. He also reported other injuries with losses of consciousness, and she noted that he had a scar on his head.
Dr. Deland also noted that defendant had consistently reported severe childhood physical and sexual abuse; he had reported symptoms of PTSD at various times; and he had been diagnosed with PTSD over the years. She said 1 ^defendant had documentation of memory problems and mental problems known to cause memory problems. Dr. Deland said defendant’s most consistent diagnosis before the killing in the present case was a diagnosis of bipolar disorder by a psychiatrist at the HIV clinic, which often times, went untreated. Dr. Deland further testified that one of the concerns in defendant’s medical records was of a cognitive disorder due to his HIV status. She also noted the diagnosis of a progressively deteriorating decline in his cognitive process which, Dr. Deland opined, could be part of the HIV, but also could be attributed, in part, to residual effects of the old head injury. She agreed that those cognitive problems could be one of the causes of memory problems and amnesia documented in the record. She stated that memory problems are also associated with PTSD, as is severe substance abuse. Dr. Deland believed that defendant had confabulated in the past, and that he was an unreliable historian.
Dr. Deland confirmed on cross examination that she did not write a report in the present case. She opined that defendant was at risk for “confabulating.” She could not point to any confabulation, but could only say that defendant was unreliable. She noted that she had four different stories about when defendant’s mother died. She said the CAT scan of defendant’s brain that showed evidence of progressive brain damage had been taken in 2010. Dr. Deland was not provided with Mr. Buck’s recorded statement to Det. Garcia.
Pastor Dinwiddie testified she believed defendant began coming to St. Mark’s after Hurricane Katrina, sometime in 2006. She testified that Brett Buck was a member of St. Mark’s and was also one of the church leaders and a part-time staff member. She said she remembered defendant coming to church one Sunday, very distraught after the victim died. She did not remember smelling alcohol on | ^defendant. He told her that his friend had been beaten up somewhere else, came home, and died. Pastor Dinwiddie testified that she visited defendant after his arrest, both at Orleans Parish Prison and at the forensic mental health facility in Jackson. She confirmed that defendant had always maintained his innocence. The defense rested after Pastor Dinwiddie’s testimony.
Dr. Raphael Salcedo, testifying in rebuttal for the State, was qualified by the court as an expert in the field of forensic psychology, clinical psychology and neuropsy-chology. Dr. Salcedo testified that in June 2012, he was appointed by the court in defendant’s case to a sanity commission, along with Dr. Richard Richoux, to examine defendant for competency. Dr. Salcedo testified that he and Dr. Richoux examined defendant on June 31, 2012. The doctors found that defendant had no problem understanding the nature of the charges and proceedings against him. However, the doctors found that defendant presented as psychologically fragile. They felt he might have difficulty withstanding the stress of the trial, and he might decompensate or deteriorate psychiatrically to such a degree that he could no longer effectively assist counsel. Therefore, they recommended to the court that defendant be found incompetent to proceed to trial.
*66 Dr. Salcedo testified that the decision was based on the history defendant related to them of, diagnoses, treatment, severe alcohol abuse, problems with anxiety, PTSD, and bipolar disorder. They also considered his arrest report or arrest register, and the scant information contained in the court record at the time, given how early in the proceedings the evaluation was conducted. Dr. Salcedo stated that défen-dant did not indicate during his evaluation that he suffered any memory problems, except for periods of amnesia during an alcohol blackout. After being found incompetent to proceed, defendant was sent to the Eastern |lflLouisiana Mental Health System Forensic Facility (formerly known as the Feliciana Forensic Facility).
While at the forensic facility, defendant was diagnosed as suffering from alcohol dependence, anxiety disorder, and as having borderline personality disorder traits. Though defendant had a prior history of bipolar disorder, he received no such diagnosis at the forensic facility. Further, defendant received no diagnosis for dementia or any sort of Alzheimer’s disease, nor for schizophrenia or schizoaffective disorder. Dr. Salcedo explained that an initial neu-ropsychological evaluation “suggested” problems with defendant’s short and long term memory. However, in a subsequent evaluation, where some issues were controlled and perhaps there had been some medication adjustments, there was no objective evidence of significant memory deficits. Dr. Salcedo testified that he and Dr. Richoux examined defendant three times, and at no point did defendant.report having memory problems.
Dr. Salcedo said there was no evidence of defendant confabulating things. Dr. Sal-cedo confirmed that he respectfully disagreed with Dr. Deland on the memory and confabulating issues. Dr. Salcedo explained confabulation by giving an example of the elderly demented population filling in gaps in their recollection about certain events. He stated that in the thirty years he had been practicing, he had never seen anyone confabulate something like killing a person.
. On cross examination, Dr. Salcedo read from defendant’s forensic hospital record that after a month there, defendant “still exhibited some difficulty concentrating and recalling information consistently.” That same record reflected that, due to concerns about “persistent cognitive impairment due to alcohol,” defendant was given a mood stabilizer, and by the end of September, he appeared |¾⅜0 be less anxious and calmer. Dr. Salcedo confirmed that the records he reviewed reflected that neurop-sychological testing showed cognitive impairment in defendant.
.On redirect examination, Dr. Salcedo testified that defendant had severe anxiety. He described defendant as having an attention problem because of anxiety, not a memory problem.
Dr. Richard Richoux was qualified by joint stipulation as an expert in the field of clinical and forensic psychiatry. He talked about Dr. Deland’s testimony for the defense that defendant was an unreliable historian. He noted that, despite her characterization of defendant as being unreliable, she seemed to rely on certain things he told her that were not documented anyplace else, and she placed some stock on those representations by defendant in drawing some of her conclusions. Dr. Ri-choux felt that defendant was either reliable or he was unreliable—not selectively reliable when one wanted him to be and unreliable when one did not want him to be. He noted that Dr. Deland apparently felt defendant was reliable insofar as defendant related that he was hit by a car and as a consequence was in a coma in his late teens. Dr. Richoux noted a reference *67 to this in one of defendant’s medical records, stating that anyone can report anything to a physician who then writes it down as part of a medical history. He also noted defendant’s history of childhood abuse. He said he was not saying it did not take place, but only that if one is characterizing the person as unreliable, then it was inconsistent to then depend on things the person says to draw certain conclusions.
Dr. Richoux’s direct examination testimony echoed that of Dr. Salcedo, in that neither had ever encountered someone confabulating information detrimental |aito himself. He stated that it was highly unlikely for a person to purposely say something that was going to place them in grave jeopardy.
Dr. Richoux confirmed on cross examination that each time he and Dr. Salcedo interviewed/examined defendant, he was on medication containing anti-psychotic properties. He further confirmed that, although rare, confabulation has .been documented among people with schizophrenia and other psychotic disorders—but he said it was unusual and certainly not something one often saw. He also agreed that with Wernicke-Korsakoff syndrome, which is the result of severe alcoholism, there is organic brain damage that often includes confabulation with the Korsakoff aspect of the syndrome. Dr. Richoux further agreed that AIDS or HIV can provoke Korsakoff syndrome. He replied “No” when asked whether, in his review of defendant’s medical records, he had seen any mention of the Wernicke-Korsakoff syndrome.
Dr. Richoux confirmed that many times he had seen patients with delusions that were not self-serving. He also confirmed that substances can provoke delusions, and there were three or four instances in defendant’s medical records of him saying things thought to be delusional. He agreed that people with cyclical and mood disorders can be provoked or made worse by instances of extreme distress and by instances of. substance abuse or going . off one’s medication.
ERRORS PATENT
A review of the record reveals no patent errors.
DISCUSSION
In this appeal, defendant asserts two counseled assignments of error, asserting that the trial court erred: 1) in denying his motion in limine because defendant’s statements to Mr. Buck, a clergyman, were privileged; and 2) in 1 ^denying defendant’s motion to suppress the evidence seized. Defendant’s pro se assignments of error will be addressed separately below.

COUNSELED ASSIGNMENT OF ERROR NUMBER 1

In this assignment of error, it is argued that the trial court erred in denying defendant’s written motion in limine as to inculpatory statements he made to Mr. Buck, because the .statements were privileged under La. C.E. art. 511, as statements made to someone he reasonably believed was a clergyman.
La. C.E. art. 511 states:
A. Definitions. As used in this Article:
(1) A “clergyman” is a minister, priest, rabbi, Christian Science practitioner, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.
(2) A communication is “confidential” if it is made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.
B. General rule of privilege. A person has a privilege to refuse to disclose *68 and to prevent another person from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual adviser.
C. Who may claim the privilege. The privilege may be claimed by the person or by his legal representative. The clergyman is presumed to have authority to claim the privilege on behalf of the person or deceased person.
La. C.E. art. 502(A) further provides that “[a] person upon whom the law confers a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged.”
In State v. Gray, 04-1197, pp. 6-7 (La. 1/19/05), 891 So.2d 1260, 1264, the Louisiana Supreme Court set forth the applicable law on the application of the clergyman privilege as follows:
IgaThus, there are three legal prerequisites to finding that the clergyman privilege applies. First, it must be determined that the person to whom the communication was received is a “clergyman.” Second, it must be determined that the purpose of the communication was to seek spiritual advice or consolation. See State v. Berry, supra; State v. Tart, supra. Third, it must be determined that the communication was made privately and was not intended for further disclosure except to other persons present in furtherance of the purpose of the communication. However, even if those explicit requirements of the article are met, it must also be determined whether or not the communicant waived the application of the privilege. See La. C.E. art. 502(A) (“A person upon whom the law confers a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter.”)
Whether the prerequisites to the recognition of the privilege are present is a determination to be made by the trial judge under La. C.E. art. 104(A). In making this determination, the trial court considers whether the totality of the circumstances presented indicate that the statements made by the defendant are within the communications protected by the privilege. See State v. Tart, 93-0772 (La. 2/9/96), 672 So.2d 116; State v. Berry, 324 So.2d 822 (La. 1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976). A trial court’s ruling on a motion to suppress is subject to an abuse of discretion standard. See State v. Hobley, 98-2460 (La. 12/15/99), 752 So.2d 771, 790. (Footnote omitted).
In the present case, Mr. Buck was not a clergyman within the meaning of La. C.E. art. 511, nor does defendant argue that he was. Rather, defendant asserts that he “reasonably believed” Mr. Buck was a clergyman. For the following reasons, there is no merit to this argument.
Mr. Buck testified that he worked “very part time” at Tulane University School of Medicine and was a member of and employed by St. Mark’s United Methodist Church, where he worked in “congregational care” with the homeless and also with “the partners in ministry who provide the meals each week.” Mr. Buck testified that Pastor Dinwiddie introduced him to defendant before the church service on the Sunday morning following Mardi Gras. The pastor told Mr. Buck that defendant (a member of the church) was very upset and needed someone toj^talk to. Mr. Buck briefly talked to defendant and sat with him during the church service. Thereafter, the defendant accompanied him to deliver *69 meals to the Project Lazarus group home, where Mr. Buck volunteered. Mr. Buck then took defendant shopping for a new pair of tennis shoes, because defendant told him the discolored pair he was wearing had been sprayed for blood evidence by the police, which made him upset. When Mr. Buck dropped defendant off at his residence later that day, he told defendant that he was welcome to call if he wanted to talk further.
Defendant called Mr. Buck the next day, and Mr. Buck agreed to talk with him. Defendant arrived at Mr. Buck’s home in an intoxicated state. At that meeting, defendant said that the night before the victim died, they had a fight in the kitchen. During the fight, he tried to slam the victim to the floor, but the victim hit his head on “the counter.” Defendant further told Mr. Buck that he had been very angry, and once the victim was on the ground, he continually kicked the victim until the victim stopped moving.
Defendant told Mr. Buck he spoke with Det. Garcia, and believed the police knew he was lying. Defendant gave Mr. Buck Det. Garcia’s card. He also gave Mr. Buck some names and telephone numbers of people he wanted Mr. Buck to contact and tell them he was not a monster and that he did not mean to do this.
Defendant told Mr. Buck that he would eventually turn himself in. Mr. Buck told defendant he would give him until 2:00 p.m. the following day to do so; if not, Mr. Buck would call Det. Garcia. Thus, defendant left Mr. Buck’s residence that evening knowing that if he did not turn himself in by 2:00 p.m. the following day, Mr. Buck was going to tell the police what defendant had revealed to him.
Defendant was forty-three years old at the time he committed the offense and made his inculpatory statements to Mr. Buck. Defendant cites as part of the 12Stotality of the circumstances that he had an eighth grade education and a low I.Q. Despite defendant’s borderline to low average intellectual functioning, considering the totality of the circumstances and his apparent intoxication at the time he made the admissions to Mr. Buck, it cannot be said that the trial court would have abused its discretion or otherwise erred in concluding that defendant could not have reasonably believed Brett Buck was a “minister, priest, ... or other similar functionary of a religious organization” such that his inculpatory admissions to Mr. Buck were privileged. Accordingly, we find that the trial court did not abuse its discretion in denying defendant’s motion in limine to exclude defendant’s admissions to Mr. Buck as privileged under La. C.E. art. 511.
In addition, while it might be argued that defendant sought consolation from Mr. Buck, the record does not clearly reflect that defendant made the communication to Mr. Buck intending that Mr. Buck never disclose to another person that he killed his friend. Further, after making the communication to Mr. Buck, defendant implicitly consented to Mr. Buck revealing the communication to Det. Garcia in the event defendant did not turn himself in by 2:00 p.m. the following day. Additionally, according to Mr. Buck’s testimony, defendant specifically asked him to contact certain persons to tell them that defendant wanted them to know that he was not a monster, and didn’t mean to do this (meaning the killing). Thus, even assuming the three prerequisites necessary for the privilege to apply under La. C.E. art. 511 were present when defendant initially made the communication to Mr. Buck, defendant clearly waived the privilege by then implicitly, although conditionally, consenting to disclosure of the privileged matter. See La. C.E. art. 502(A). There is no merit to this assignment of error.

*70
\ ^COUNSELED ASSIGNMENT OF ERROR NUMBER 2

In his second counseled assignment of error, defendant argues that the trial court erred in denying his motion to suppress evidence seized from his residence without a search warrant on the day the police first came to his residence.
The record does not contain a written motion to suppress any physical evidence. However, defense counsel argued at the suppression hearing that what he referred to as “Exhibits 1 through 8” (eight items listed as “specimens” on the crime lab report) should be suppressed because those items were seized from defendant’s home without a search warrant. The eight items were: (1) one possible blood sample'; (2) one unknown sample; (3) one wet, blue, “Ecko Unltd.” T-shirt, size medium, RN # 93536; (4) one wet pair of black “GAP” jeans, size 32/32; (5) one wet, grey and blue “Galt Crew” hooded sweatshirt, size large, RN # 71908; (6) one wet, dirty, white sock; (7) one wet, white towel with butterfly print; and (8) one wet, off-white towel stained with possible blood.
Notably, only the off-white towel was introduced by the State at trial. However, insofar as the trial testimony and record is concerned, that towel was never processed for definitive blood evidence. Moreover, neither the “possible blood sample” nor the “unknown sample” seized as evidence that day were ever processed for DNA evidence.
Regarding the “possible blood sample,” Sgt. Dickerson testified that the blood droplet, or spot on the kitchen floor, was the only blood he found in defendant’s residence. His testimony was the sole evidence presented by the State that the substance was blood, and his testimony was based on his processing of the scene for blood evidence pursuant to a search warrant issued on February 23, 2012. There was no evidence presented by the State as to whose blood this was. Further, | a7Pet. Garcia, to whom the investigation was assigned oncé the victim’s death was classified as a homicide, testified that the blood droplet was still partially present when she searched defendant’s residence pursuant to the search warrant.
The Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution protect people against unreasonable searches and seizures. A search made without a warrant issued on probable cause is considered unreasonable unless that search can be justified by one of the narrowly drawn exceptions to the warrant requirement. State v. Cavalier, 14-0579, p. 17 (La.App. 4 Cir. 6/19/15), 171 So.3d 1117, 1128. As per La. C.Cr.P. art. 703(D), the state has the burden of proving the admissibility of any evidence seized without a warrant. State v. Wells, 08-2262, p. 5 (La. 7/6/10), 45 So.3d 577, 581.
On appeal, the State argues that because defendant allowed the police inside the residence and, did not object at any time while they were inside, he,consented to the warrantless search. To the contrary, defendant asserts on appeal, that there is no “murder scene” exception to the warrant requirement, citing Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) and Flippo v. West Virginia, 528 U.S. 11, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999). Defendant is correct that there is no “murder scene” exception to the general requirement that a search warrant is required to search a person’s residence. See Mincey, supra; Flippo, supra.
In Mincey, undercover police officer Headricks arranged with petitioner Min-cey to purchase a quantity of heroin from him. Officer Headricks left Mineéis apart *71 ment, ostensibly to obtain money. He returned with nine other plainclothes.narcotics officers and a deputy county attorney. One of Mincey’s acquaintances answered the.door, and Officer Headricks squeezed inside and went straight to a back bedroom of the apartment, while Mincey’s acquaintance | ^struggled to prevent the other officers from entering. As the other officers pushed their way inside, a rapid volley of shots was heard from the back bedroom, and a wounded Officer Head-ricks emerged and collapsed; he died a few hours later in the hospital. The other narcotics officers looked quickly about the apartment for other shooting victims, finding a wounded young woman in a bedroom closet and petitioner Mincey unconscious on the bedroom floor. Those narcotics officers refrained from further investigation, pursuant to a departmental directive that police officers refrain from investigating incidents in which they were involved. Homicide detectives arrived within ten minutes. The detectives supervised the removal of Officer Headricks and the suspects, preserving the scene. The homicide detectives then proceeded to gather evidence over the next four days, searching the entire apartment, including drawers, closets, and cupboards. They emptied out the pockets of clothing and pulled up sections of carpeting, removing them for examination. Every item in the apartment was examined and inventoried, and 200 to 300 objects were seized. The U.S. Supreme Court characterized it as an “exhaustive and intrusive search.” Mincey, 437 U.S. at 389, 98 S.Ct. at 2411. No warrant was ever obtained.
Petitioner Mincey’s pretrial motion to suppress the evidence was denied, and much of the evidence was introduced against him at trial, including photographs and diagrams, bullets and shell casings, guns, narcotics, and narcotics paraphernalia. The Arizona Supreme Court affirmed the defendant’s conviction. The United States Supreme Court reversed. It noted that- a warrantless .search must be strictly circumscribed by the exigencies justifying its initiation, and the four-day search that included opening dresser drawers and ripping up carpets could hardly be rationalized in terms of the legitimate concerns that justify an emergency | ^search. Mincey, 437 U.S. at 393, 98 S.Ct. at 2413-2414. The court held that the warrantless search of petitioner Mincey’s apartment was not constitutionally permissible simply because a homicide had recently occurred there. However, the Court recognized that when the police come upon the scene of a homicide, they may make a prompt warrantless search of the area to see if there are other victims or if a killer , is on the premises— “[t]he need to protect or preserve life or avoid a serious injury is justification for what would be otherwise illegal absent an exigency or emergency,- ... [a]nd the police may seize any evidence that is in plain view during the course of their legitimate emergency activities.” Mincey, 437 U.S. at 392-393, 98 S.Ct. at 2413 (citations omitted).
Six years after its decision in Mincey, the United States Supreme Court followed it in Thompson v. Louisiana, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984), a per curiam decision reversing the Louisiana Supreme Court’s upholding of a warrant-less “murder scene” search of the petitioner’s home. In Thompson, the petitioner shot and killed her husband in the couple’s Jefferson Parish residence and, thereafter took an overdose of pills in a suicide attempt. The petitioner then changed her mind and telephoned her daughter, informing her of the situation and requesting help. The daughter called the Sheriffs Office and went to the petitioner’s residence to meet them. The daughter admitted deputies into the petitioner’s residence and *72 directed them to the rooms containing the petitioner and the victim. Deputies immediately transported the then-unconscious petitioner to a hospital and secured the scene. Thirty-five minutes later, after deputies had already searched the premises for other victims or suspects, two homicide detectives arrived and conducted a two-hour follow-up investigation. The detectives later described it as a “general exploratory search for evidence of a |sncrime,” during which they examined each room of the residence. Thompson, 469 U.S. at 18-19, 105 S.Ct. at 410. The petitioner was indicted for the second-degree murder of her husband, and she moved to suppress three items of evidence discovered during the search. Those items included a pistol found inside a chest of drawers in the same room as the victim’s body, a torn up note found in a wastepaper basket in an adjoining bathroom, and a letter (alleged to be a suicide note) found folded up inside an envelope containing a Christmas card, which was on top of a chest of drawers.
The Louisiana Supreme Court in Thompson ultimately held all of the evidence to be admissible, purporting to distinguish Mincey on the grounds that Mincey involved a four-day search of the premises, while the search in Thompson took only two hours and was conducted on the same day as the murder. The U.S. Supreme Court acknowledged the differences, but stated that a two-hour general search remained “a significant intrusion on petitioner’s privacy and therefore may only be conducted subject to the constraints-including the warrant requirement-of the Fourth Amendment.” Thompson, 469 U.S. at 22, 105 S.Ct. at 411.
The U.S. Supreme Court also rejected the Louisiana Supreme Court’s notion that the petitioner in Thompson had a diminished expectation of privacy in her home because she telephoned her daughter for assistance, and her daughter in turn called the police and later admitted them into the residence. The Court stated that “[t]o be sure,” this action by the petitioner in attempting to get medical assistance would have justified the authorities in seizing evidence under the plain-view doctrine while they were in the petitioner’s home to offer her assistance. Thompson, 469 U.S. at 22, 105 S.Ct. at 412. The Court also noted that the plain-view doctrine might also justify seizure of evidence obtained in the limited |¾1“ ‘victim-or-suspect’ search discussed in Mincey.” Id. However, the Court stressed that the evidence at issue in Thompson had not been discovered in plain view under either of those scenarios, stating: “Petitioner’s call for help can hardly be seen as an invitation to the general public that would have converted her home into the sort of public place for which no warrant to search would be necessary.” Id.
In Flippo, the U.S. Supreme Court followed Mincey in reversing the West Virginia Supreme Court of Appeals’ denial of discretionary review in a case in which the trial court denied the petitioner’s motion to suppress evidence seized by police without a warrant at the scene of his wife’s murder. The petitioner and his wife were vacationing at a cabin in a state park when he called 911 to report that they had been attacked. The police arrived to find the petitioner waiting outside the cabin with injuries to his head and legs. After questioning him, an officer entered the cabin and found the wife’s body, with fatal head wounds. The police closed off the area, took the petitioner to the hospital, and searched the exterior and environs of the cabin for footprints or signs of forced entry. A police photographer arrived at about 5:30 a.m., and an officer re-entered the cabin and proceeded to process the crime scene. For over sixteen hours the *73 police took photographs, collected evidence, and searched through the contents of the cabin.
The officers found a closed briefcase on table in the cabin, inside of which was an envelope containing various photographs and negatives, which they seized. The petitioner was indicted for the murder of his wife, and he moved to suppress the photographs and negatives. The prosecutor would later introduce the photographs at trial as evidence of the petitioner’s relationship with the man and | a2argue that the victim’s displeasure with that relationship was one of the reasons the petitioner may have been motivated to kill his wife.
In briefs to the trial court in Flippo, both the petitioner and the State cited Mincey. The petitioner cited Mincey as rejecting a “crime scene exception” to the Fourth Amendment’s warrant requirement, while the State cited it as authority for the proposition that the police may conduct an immediate investigation of a crime scene to preserve evidence from intentional or accidental destruction. The State in Flippo characterized the police activity as a crime scene search and inventory, and it also relied on the plain-view doctrine, noting that the briefcase was “unlocked.” The trial court found the search was lawful as one of a “homicide crime scene.” The U.S. Supreme Court flatly rejected that reasoning as squarely conflicting with Mincey.
In State v. Brady, 585 So.2d 524 (La. 1991), decided after the U.S. Supreme Court’s decision in Thompson, the Louisiana Supreme Court distinguished both Mincey and Thompson in reversing this Court in a case involving facts similar to those in the present case, and it held that evidence seized by the police from defendant’s apartment without a warrant was admissible in her trial for the stabbing death of her boyfriend in that apartment. In Brady, the defendant requested that her neighbor telephone the police to report a stabbing and to request that officers be sent immediately to the apartment. When the officers arrived, the defendant answered the door and admitted them inside. The officers found the defendant’s boyfriend dead in a hall next to the bathroom. Those responding officers then called homicide detectives to the scene. The defendant advised the officers that the victim told her he had been stabbed in another residence, and he had staggered into their apartment through the front door before collapsing in the l.^hall. When Det. Demma arrived at the scene, he noticed several spots of blood on the kitchen floor near the rear doorway. There was also a button on the kitchen floor. As Det. Demma stood by the victim’s head near the bathroom door, he noticed a bloody towel in the lavatory in the bathroom and blood on the handle of the closet door adjacent to the lavatory. The detective then opened the closet door and found a pair of bloody scissors and a bloody shirt. The shirt was later identified by the defendant’s neighbor as the one worn by the defendant when she requested that neighbor to call the police. The defendant was arrested for murder and, after being advised of her rights, she admitted to stabbing the victim.
The defendant in Brady subsequently moved to suppress the evidence, which the trial court granted, except for the blood stains on the kitchen floor, finding that there was “no crime scene exception” that justified the seizure of the other evidence. The trial court concluded that the police did not have the authority under the circumstances to search the linen closet without a warrant or without a more positive showing of consent to search it. The State applied to this Court for supervisory review of that ruling, and this Court granted the writ in part, as to the bloody towel and *74 button on the kitchen floor. This Court found that the bloody towel was observed by Det. Demma in plain view, and that officers had reason to follow a blood trail into the kitchen looking for any other victims or the perpetrator, where the button was discovered on the floor in plain view. State v. Brady, 569 So.2d 110 (La. App. 4 Cir. 1990). We denied the writ as to the bloody shirt and pair of scissors found in the linen closet, noting the absence of any testimony that the officers could not have obtained a search warrant or that they feared the defendant would flee or tamper with the evidence.
134The Louisiana Supreme Court granted certiorari in Brady to review the trial court’s suppression of the bloody towel and the scissors. First, the Court found that the evidence established probable cause for Det. Demma to believe that there was a fair probability that evidence relating to the stabbing would be found inside the bathroom linen closet, citing the evidence that he observed the bloody towel in plain view in the sink of the bathroom and had also observed blood on the handle of the linen -closet, which was next to the- sink. The Court found' the Brady case “vastly different” from Mincey and Thompson.
The Court in Brady distinguished Min-cey and Thompson, where no occupant of the premises called the police, or acted in any manner that demonstrated the occupant’s diminished expectation of privacy in the premises. In Brady, the defendant, a co-occupant of the premises with the victim, had her neighbor call the police. She admitted the officers into the apartment; disclaimed any culpability; and allowed the officers to conduct an investigation. The Court found that the police in Brady reasonably believed that defendant wanted them to investigate the murder. Thus, the Court ultimately found that the case was not one in which the accused merely acquiesced to the authority of the police, and the limited search conducted was clearly reasonable under the circumstances and within the tacit consent of defendant. The Court in Brady also contrasted the “immediate and particular search” in that case with the “delayed and extended general” searches in Mincey and Thompson.
As the cases on the nonexistent crime/murder scene “exception” illustrate, the matter of implied/tacit consent is often at issue in these types of cases. When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. IstjThis burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority.” Bumper v. N. Carolina, 391 U.S. 543, 548-549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).
We. find the present case more analogous to Brady than to Mincey, Thompson or Flippo. Defendant called the police to report that he found his friend dead in the residence. The call was dispatched as an unclassified death. Det. Gex was the only responding police officer- who testified. He arrived at the scene between 8:00 and 8:30 a.m. and was admitted into the residence by defendant. He said he ascertained that the victim was in fact deceased. He said he also did a walkthrough of the residence to make sure there was no crime scene. The victim was lying on the floor in the second room , of the residence, used as bedroom. He walked from that room to the rear of the house “to again see if there’s any evidence, see if anybody else was in the house or any other witnesses, things of that nature.” He said the home was neat and nothing seemed out of place except for the deceased.
Det. Gex testified that when he walked into the kitchen area he noticed, in plain view, a droplet of blood on the floor, some *75 damp clothing on top of the washer and dryer, and two towels that looked tinted, as if they had blood on them. He said that he called homicide after he concluded that the evidence on the scene did not indicate an unclassified death. The record reflects that Crime Lab Technician Stewart arrived on the scene at 9:08 a.m. She collected a swab from the possible “blood” droplet on the kitchen floor, and left at 9:56 a.m. It is clear that the entire investigation was conducted in a relatively short period of time. Additionally, the remnant of that blood spot was still clearly visible when Homicide Det. Garcia executed a search warrant at the residence two days later, Island it showed presumptively positive for blood when Officer Dickerson sprayed it with a blood-highlighting substance during the execution of that warrant.
Similar to the situation in Brady, defendant stood by as Det. Gex walked through defendant’s small apartment. The record is devoid of any evidence that Det. Gex opened any cabinets, drawers, etc. Importantly, Det. Gex stated that he walked through the residence to see if anyone else was present in the house or whether there were any other witnesses. This type of limited action is permissible under Min-cey. '
Moreover, all the evidence seized was admissible pursuant to the inevitable discovery doctrine. The inevitable discovery doctrine holds that evidence found as a result of a violation of a defendant’s constitutional rights is admissible if it can be shown by a preponderance that the evidence ultimately or inevitably would have been lawfully discovered. State v. Jones, 12-0438, p. 21 (La.App. 4 Cir. 3/13/13), 119 So.3d 9, 17 (citing State v. Martello, 98-2066, p. 13 (La.App. 4 Cir. 11/17/99), 748 So.2d 1192, 1201).
Further, a review of Det. Garcia’s February 23, 2012 application for a search warrant shows that she did not base her warrant application on anything Det. Gex observed in defendant’s residence on February 21, 2012, any evidence seized from the residence that day, or any evidence photographed that day. Det. Garcia merely recited in her warrant application what defendant told the 911 operator that day, what defendant told Det. Gex regarding the victim having been beaten the night before, and the classification of the death as a homicide. Thus, the police would have obtained a valid warrant from a magistrate and . would have inevitably discovered the evidence at issue in defendant’s residence by lawful means. See State v. Flores, 10-0960, p. 2 (La. 6/18/10), 37 So.3d 997, 998.
|R7Finally, any error in denying defendant’s motion to suppress the evidence seized from his apartment on February 21, 2012, is harmless beyond a reasonable doubt. The erroneous admission of evidence is subject to harmless error analysis. State v. Falkins, 12-1654, p. 18 (La.App. 4 Cir. 7/23/14), 146 So.3d 838, 850-51; State v. Williams, 12-0252, p. 23 (La.App. 4 Cir. 4/17/13), 115 So.3d 600, 613. An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was .surely unattributable to the error. State v. Robertson, 06-1537, p. 9 (La. 1/16/08), 988 So.2d 166, 172.
Considering the facts and circumstances presented here, it is evident that the guilty verdict rendered in this case was not attributable to any error in denying defendant’s motion to suppress the evidence. For the foregoing reasons, there is no merit to defendant’s second counseled assignment of error.
In a supplemental brief filed with this Court,. defendant sets forth the following pro se assignments of error: 1) his conviction cannot be adequately reviewed because relevant and material documents *76 and transcripts are missing from the appellate record; 2) the trial court refused to have hearings and order the State to turn over certain exculpatory evidence requested by defendant; 3) the State failed to conduct DNA testing and/or turn over DNA results; and 4) the State presented insufficient evidence to prove defendant’s guilt.

PRO SE ASSIGNMENT OF ERROR NUMBER 1

In the first of four pro se assignments of error, defendant contends that he has been denied his right to judicial review because the record on appeal is incomplete.
La. Const. art. I, § 19 provides that “[n]o person shall be subjected to imprisonment ... without the right of judicial review based upon a complete record laSof all evidence upon which the judgment is based.” In felony cases, the recording of “all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel” is statutorily required. La. C.Cr. P. art. 843; see also State v. Landry, 97-0499, p. 3 (La. 6/29/99), 751 So.2d 214, 215 (criminal defendant has a right to a complete transcript of his trial proceedings, particularly where appellate counsel on appeal was not also trial counsel). However, to justify reversal of a conviction and the ordering of a new trial, an omission from the trial record must affect the “substantial rights of the accused.” La. C.Cr.P. art 921. Thus, even though it may be reversible error when material portions of the trial record are unavailable or incomplete, a “slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal” does not require reversal of a conviction. State v. Scott, 15-0778, p. 14 (La.App. 4 Cir. 6/29/16, 14), 197 So.3d 298, 307-308. In some circumstances, an incomplete record may be adequate for appellate review and, therefore, a defendant is not entitled to relief on the basis of an incomplete record absent a showing that he was prejudiced by the missing portions of the record. Id.
In the instant case, defendant claims “[massing documents are so egregious that the possibility of other substantial violations exist, but due to the inability to review and assess, [the defendant] is denied an absolute determination.” The defendant does not identify the missing transcripts/evidenee he claims violates his right to appeal. Moreover, he has not demonstrated any prejudice because of the missing transcripts/evidence, nor has he specified, beyond mere conjecture, why |39they are essential to his appeal. A review of the record shows it contains opening and closing arguments, court minutes, all witness testimony and evidence introduced during the trial. This assignment is meritless.

PRO SE ASSIGNMENT OF ERROR NUMBER 2

By this assignment, the defendant contends that the prosecution in this case failed to timely turn over evidence favorable to his defense. Specifically, he claims he requested but was denied: 1) the victim’s autopsy report; 2) medical emergency unit transport report in connection with bringing the victim to the emergency room prior to his arrival at defendant’s home; 3) the victim’s emergency room admission records, which occurred prior to his arrival at defendant’s home; 4) the victim’s toxicology report from the emergency room; 5) luminol report on defendant’s home, clothing and shoes; 6) pictures of victim’s wounds and crime scene; 7) reports prepared by all investigating officers; 8) names of witnesses with knowledge of an altercation between the victim and un *77 known individual(s); and 9) all reports made by detectives pertaining to individuals with information on the events prior to the victim’s death.
Initially, we note that items 2 and 3 are non-existent, as the victim was pronounced dead at the scene and the body was transported from the defendant’s house by the coroner.
Next, defendant does not explain how, nor is it probable, that items 1, 4 and 6 would be of any exculpatory benefit to the defendant. The coroner testified at trial that testing of the victim’s bodily fluids were positive for the presence of nicotine, caffeine, Seroquel, Remeron, benzodiaze-pine and cannabinoids.
LnConcerning item 5, the jury heard the investigating officers testify that luminol testing of the defendant’s home, clothing and shoes were negative for the presence of blood. Moreover, Det. Garcia testified that some traces of blood were found in the kitchen; however, she said that the samples of blood collected as evidence were never tested. Accordingly, the jury was aware of the absence of scientific evidence linking the defendant to the victim’s death.
Continuing, as to item 7, all of the investigating officers testified at trial and were subjected to cross-examination. The chief investigating officer, Det. Garcia, testified that at the beginning of the investigation, the defendant was not a suspect.
With regard to items 8 and 9, there was no evidence developed by the police that the victim had been involved in an altercation with an unknown person(s) pri- or to his death. However, even assuming any of the items the defendant cites were erroneously denied to him, he cannot show any prejudice because the defendant confessed in detail to Mr. Buck, who testified at trial. This assignment has no merit.

PRO SE ASSIGNMENT OF ERROR NUMBER 3

In this assignment of error, defendant complains that the State’s failure to conduct DNA testing (and/or turn over DNA evidence) violated Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), in that had the testing been performed, the results would have been favorable to him and eliminated him as the suspected killer.
As noted in the previous assignment of error, the fact that the State did not conduct DNA testing was immaterial because the State’s witnesses were forced to admit there was no biological evidence of defendant’s involvement in the victim’s |41 death. Even assuming the State should have performed DNA testing, and even if the results were in defendant’s favor, defendant cannot show prejudice because of the State’s omission, especially considering that the jury heard testimony concerning defendant’s confession to the murder of the victim. This assignment has no merit.

PRO SE ASSIGNMENT OF ERROR NUMBER 4

Finally, defendant asserts that there was insufficient evidence to support his conviction for manslaughter. We disagree.
The standard of review applicable to sufficiency of evidence claims in criminal convictions is set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Jackson standard is applicable to cases involving both direct and circumstantial evidence. See State v. Nealy, 450 So.2d 634, 636-37 (La. 1984); State v. Lawrence, 09-1637, p. 13 (La.App. 4 Cir. 8/25/10), 47 So.3d 1003, 1011. The inquiry requires a reviewing court to determine whether “after viewing the evidence in a light most favorable to the *78 prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson, 443 U.S. at 319, 99 S.Ct. 2781. See also State v. Mussall, 523 So.2d 1305, 1311 (La. 1988) (“If the court finds that no rational trier of fact viewing all of the evidence from a rational pro-prosecution standpoint could have found guilt beyond a reasonable doubt, the conviction cannot stand constitutionally.”).
Further, as this Court reiterated in State v. Keys, 12-1177, p. 4 (La.App. 4 Cir. 9/4/13), 125 So.3d 19, 26:
In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Robinson, 02-1869, p. 16 (La. 4/14/04), 874 So.2d 66, 79 (citation omitted). Under the Jackson standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court. State v. Juluke, 98-341 (La. 1/8/99), 725 So.2d 1291, 1293 (citation omitted). “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La. 1992) (citation omitted).
As previously explained, the State presented the testimony of Mr. Buck, who related defendant’s confession in sufficient detail. Mr. Buck’s credibility was never called into question. Moreover, the record reflects that defendant failed to present any evidence that conflicted with Mr. Buck’s testimony.
When viewed in the light most favorable to the State, the evidence in this case is sufficient to support defendant’s conviction. Mr. Buck’s testimony alone is sufficient to convict defendant of the charged offense. This assignment is therefore without merit.
CONCLUSION
For the foregoing reasons, we affirm defendant’s conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED
LANDRIEU, J., CONCURS IN THE RESULT

. State v. Luzzo, unpub., 14-1038 (La. App. 4 Cir. 9/29/14).

. Frances Blanchard, the victim's mother, testified that her son was suffering from liver cancer.